[S.F. No. 24069. Mar. 20, 1981.]

COMMITTEE TO DEFEND REPRODUCTIVE RIGHTS et al.,
Plaintiffs and Appellants, v.
BEVERLEE A. MYERS, as Director, etc., et al.,
Defendants and Respondents.

[S.F. No. 24053. Mar. 20, 1981.]

COMMITTEE TO DEFEND REPRODUCTIVE RIGHTS et al.,
Petitioners, v.
KENNETH CORY, as State Controller, et al., Respondents.

[S.F. No. 24192. Mar. 20, 1981.]

COMMITTEE TO DEFEND REPRODUCTIVE RIGHTS et al.,
Petitioners, v.
JESSE M. UNRUH, as State Treasurer, et al., Respondents.

254

**COUNSEL**

Patti Roberts, Tamara Dahn, Michelle Murphy, Barbara Weiner, Abigail English, Pauline Tesler, Vilma Martinez, Carmen Estrada, Linda Hanten, Nancy L. Davis, Joan Messing Graff, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Fred Okrand, Mark D. Rosenbaum, Terry Smerling and Ralph Santiago Abascal for Plaintiffs and Appellants and for Petitioners.

Dorothy T. Lang, Sylvia Drew Ivie, Diane Morrison, Roberta Ranstrom, Barbara Steinhardt, William G. Harris, Larson, Weiberg & Harris, James R. Abernathy II, Jan G. Levine, Alletta d'A. Belin, Timothy B. Flynn, Carlyle W. Hall, Jr., A. Thomas Hunt, John R. Phillips, David E. Willett and Hassard, Bonnington, Rogers & Huber as Amici Curiae on behalf of Plaintiffs and Appellants.

George Deukmejian and Evelle J. Younger, Attorneys General, Charlton G. Holland and Asher Rubin, Deputy Attorneys General, for Defendants and Respondents.

Burton Shamsky, Shamsky & Vreeland, George D. Crook, Richard J. Morillo, Ochoa, Holderness, Barbosa & Crook, Robert A. Destro, James Bopp, Jr., and Francis X. Driscoll as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**TOBRINER, J.**—Plaintiffs, representing indigent women throughout the state, challenge the constitutionality under the California Constitution of provisions in the 1978, 1979, and 1980 California Budget Acts that limit Medi-Cal funding for abortions. Although the acts differ in minor respects, all afford full funding of medical expenses incurred by indigent women who decide to bear a child, but, except in a few limited circumstances, deny funding to those indigent women who choose to have an abortion. Plaintiffs contend that this selective or discriminatory public funding scheme violates a number of distinct constitutional guarantees, in particular the women's rights of privacy, due process, and equal protection of the laws.

At the outset, to dispel certain misconceptions that have appeared in this case, we must clarify the precise, narrow legal issue before this court. First, this case does not turn on the morality or immorality of abortion, and most decidedly does not concern the personal views of the individual justices as to the wisdom of the legislation itself or the ethical considerations involved in a woman's individual decision whether or not to bear a child. Indeed, although in this instance the Legislature has adopted restrictions which discriminate against women who choose to have an abortion, similar constitutional issues would arise if the Legislature—as a population control measure, for example—funded Medi-Cal abortions but refused to provide comparable medical care for poor women who choose childbirth. Thus, the constitutional question before us does not involve a weighing of the value of abortion as against childbirth, but instead concerns the protection of either procreative choice from discriminatory governmental treatment.

Second, contrary to the suggestion of the defendants and the dissent, the question presented is not whether the state is generally obligated to subsidize the exercise of constitutional rights for those who cannot otherwise afford to do so; plaintiffs do not contend that the state would be required to fund abortions for poor women if the state had not chosen to fund medical services for poor women who choose to bear a child. Rather, we face the much narrower question of whether the state, having enacted a general program to provide medical services to the poor, may selectively withhold such benefits from otherwise qualified persons solely because such persons seek to exercise their constitutional

right of procreative choice in a manner which the state does not favor and does not wish to support.

In defending the constitutionality of the provisions in question, the Attorney General relies most prominently upon the recent decision of the United States Supreme Court in *Harris* v. *McRae* (1980) 448 U.S. 297 [65 L.Ed.2d 784, 100 S.Ct. 2671] (hereafter *McRae*). In *McRae*, the Supreme Court, by a closely divided vote (five to four), upheld restrictions on federal Medicaid funding of abortions similar to those in the state acts before us. As the Attorney General acknowledges, however, the *McRae* case did not present any question under the California Constitution and consequently the justices of the high court neither addressed nor resolved the question of the compatibility of such a statutory scheme with our state constitutional guarantees. It is this question of state constitutional law, not resolved by *McRae*, which we must decide in the present case.

In addressing this issue, we shall explain initially that the analysis utilized by the majority of the United States Supreme Court in *McRae* differs substantially from the analysis mandated by the controlling California authorities and thus cannot be followed here. In *McRae*, the five-justice majority acknowledged that the governmental program provided unequal treatment in the distribution of public benefits solely on the basis of how an individual woman exercised her basic constitutional right of procreative choice. The court concluded, however, that the federal Constitution required no special justification for such discriminatory treatment so long as the program placed no new obstacles in the path of the woman seeking to exercise her constitutional right. (448 U.S. at pp. 315-318 [65 L.Ed.2d at pp. 804-805, 100 S.Ct. at p. 2688].)

By contrast, the governing California cases, discussed at length below, have long held that a discriminatory or restricted government benefit program demands special scrutiny whether or not it erects some new or additional obstacle that impedes the exercise of constitutional rights. In a series of cases reaching back more than three decades, this court has developed and applied a three-part test for evaluating the constitutionality of statutory schemes, like the program at issue here, that condition the receipt of benefits upon a recipient's waiver of a constitutional right or upon his exercise of such right in a manner which the government approves.

In order to sustain the constitutionality of such a scheme under the California Constitution, the state must demonstrate (1) "that the imposed conditions relate to the purposes of the legislation which confers the benefit or privilege"; (2) that "the utility of imposing the conditions...manifestly outweigh[s] any resulting impairment of constitutional rights"; and (3) that there are no "less offensive alternatives" available for achieving the state's objective. (*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505-507 [55 Cal.Rptr. 401, 421 P.2d 409].)

As we shall see, when measured against this established standard, the statutory scheme at issue is plainly unconstitutional. First, the Budget Act restrictions are antithetical to the purpose of the Medi-Cal program—to provide indigents with access to medical services comparable to that enjoyed by more affluent persons. Second, the benefits of the funding restrictions do not manifestly outweigh the impairment of the constitutional rights; the fiscal advantages of the restrictions are illusory, and the asserted state interest in protecting fetal life cannot constitutionally claim priority over the woman's fundamental right of procreative choice. Third, the Medi-Cal program as qualified by the Budget Act restrictions clearly does not aid poor women who choose to bear children in a manner least offensive to the rights of those who choose abortion. Accordingly, we conclude that the challenged restrictions cannot stand.

1. *Background of the present litigation.*

The California Medi-Cal program funds "physician, hospital or clinic outpatient, [and] surgical center" services, as well as "inpatient hospital services," for "recipients of public assistance [and] medically indigent aged and other persons." (Welf. & Inst. Code, §§ 14000, 14132, subds. (a) & (b).) No one disputes that abortions performed by a physician, whether in a hospital, clinic, or office, are medical services which, in the absence of special funding restrictions, would be funded under the foregoing provisions. Prior to 1978, the Medi-Cal program paid for legal abortions obtained by Medi-Cal recipients.

The California Legislature, however, inserted into the 1978, 1979, and 1980 Budget Acts provisions restricting Medi-Cal funding of abortions. (Stats. 1978, ch. 359, § 2, item 248, pp. 823-825; Stats. 1979, ch. 259, § 2, item 261.5, pp. 644-646; Stats. 1980, ch. 510, § 2, item

287.5, pp. 1146-1148.) Although the 1978 enactment differs slightly from the 1979 and 1980 restrictions, all in essence provide funding for abortions only (1) when pregnancy would endanger the mother's life; (2) when pregnancy would cause severe and long-lasting physical health damage to the mother; (3) when pregnancy is the result of illegal intercourse (rape, incest, or unlawful intercourse with a minor); or (4) when abortion is necessary to prevent the birth of severely defective infants.[1]

Before the 1978 restrictions could take effect, plaintiffs filed this suit against Beverlee A. Myers, Director of the State Department of Health Services, to enjoin her from enforcing the restrictions. The trial court upheld the funding restrictions and refused injunctive relief. Plaintiffs appealed from the judgment, the Court of Appeal affirmed in a two-to-

---

[1]The 1979 and 1980 Budget Acts restrict Medi-Cal abortion funding by specifying that none of the funds appropriated for Medi-Cal shall be used to pay for abortions, except under any of the following circumstances:

"(a) Where the life of the mother would be endangered if the fetus were carried to full term.

"(b) Where the pregnancy is ectopic.

"(c) Where the pregnancy results from an act punishable under Section 261 of the Penal Code, and such act has been reported, within 60 days, to a law enforcement agency or a public health agency which has immediately reported it to a law enforcement agency, and the abortion occurs during the first trimester.

"(d) Where the pregnancy results from an act punishable under Section 261.5 of the Penal Code, and the female is under 18 years of age, and the abortion is performed no later than the first trimester, provided the female's parent or guardian or, if none, an adult of the female's choice is notified at least five days prior to the abortion by the physician who performs the abortion. Regulations governing the notice requirement shall be promulgated by the State Director of Health Services.

"(e) Where the pregnancy results from an act punishable under Section 285 of the Penal Code, and such act has been reported to a law enforcement agency or a public health agency which has immediately reported it to a law enforcement agency and the abortion occurs no later than during the second trimester.

"(f) Where it is determined by prenatal studies limited to amniocentesis, fetal blood sampling, fetal antiography, ultrasound, X-ray, or maternal blood examination that the mother is likely to give birth to a child with a major or severe genetic or congenital abnormality due to the presence of chromosomal abnormalities, neural tube defects, biochemical diseases, hemoglobinopathies, sex-linked diseases, and infectious processes.

"(g) Where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term, when so certified under penalty of perjury by two physicians, one of whom, where practicable, is a specialist in the affected medical discipline, and documentation thereof is provided with the claim for payment."

The primary difference between the 1978 act and the later acts is that the 1978 act provided funding for abortions to avoid severe and long-lasting physical health damage only when that damage arose from 10 enumerated medical conditions. Since the Legislature deleted that language in the 1979 and 1980 enactments, the question of the validity of the 1978 language is moot.

one decision, and we granted a hearing to decide the important constitutional issue presented.[2]

While the suit attacking the 1978 Budget Act restrictions was pending before us on petition for hearing, that act expired, to be replaced by the essentially identical provisions of the 1979 Budget Act. Plaintiffs thereupon filed an original petition in this court (Committee to Defend Reproductive Rights v. Cory) seeking mandate to bar enforcement of the 1979 act. We granted an alternative writ and stayed enforcement of the restrictions pending resolution of the merits.

The 1979 Budget Act expired June 30, 1980. On July 16 the Legislature enacted the 1980 Budget Act, which imposed restrictions on abortion funding identical to those in the 1979 act. Plaintiffs promptly filed an original petition for mandate (Committee to Defend Reproductive Rights v. Unruh) to restrain enforcement of the 1980 act. We issued an alternative writ and stayed enforcement of the funding restrictions pending resolution of the controversy.[3]

2. *Our court bears an independent obligation to resolve plaintiffs' claims under the California Constitution on the basis of the governing state constitutional principles.*

In these actions, plaintiffs contend that the statutes violate a number of provisions of both the California and United States Constitutions. As already noted, in defending the challenged budget restrictions the Attorney General relies most heavily on the United States Supreme Court's recent decision in *McRae*, in which a five-justice majority concluded that similar funding restrictions in the federal Medicaid program did not violate the provisions of the *federal* Constitution. *McRae*, of course, did not resolve or even address the question of the validity of such a statutory scheme under the California Constitution.

---

[2]Because both the trial court and Court of Appeal issued temporary stay orders, the restrictive provisions of the 1978 act were never implemented.

[3]Since the 1978 and 1979 Budget Acts have expired, the two suits seeking to restrain enforcement of these laws are technically moot. The action involving the 1980 law presently in effect is sufficient to present all issues which the parties seek to raise. The trial record and most of the briefs, however, were filed in connection with the 1978 and 1979 proceedings. Under these circumstances, we concluded that it would be appropriate to consolidate the three actions for purposes of both oral argument and opinion.

■ Under these circumstances, we think it important to reiterate the basic principles of federalism which illuminate our responsibilities in construing our state Constitution. In emphasizing, in *People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099], "the incontrovertible conclusion that the California Constitution is, and always has been, a document of independent force," our court explained that "[i]t is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse.... The federal Constitution was designed to guard the states as sovereignties against potential abuses of centralized government; state charters, however, were conceived as the first and at one time the only line of protection of the individual against the excesses of local officials." Accordingly, we affirmed in *Brisendine* that state courts, in interpreting constitutional guarantees contained in state constitutions, are *"independently responsible* for safeguarding the rights of their citizens." (Italics added.) (*Id.* at p. 551.)[4]

Contrary to the Attorney General's rhetoric, such independent construction does not represent an unprincipled exercise of power, but a means of fulfilling our solemn and independent constitutional *obligation* to interpret the safeguards guaranteed by the California Constitution in a manner consistent with the governing principles of California law. As we explained very recently in *People* v. *Chavez* (1980) 26 Cal.3d 334, 352 [161 Cal.Rptr. 762, 605 P.2d 401]: "[J]ust as the United States Supreme Court bears the ultimate judicial responsibility for determining matters of federal law, this court bears the ultimate judicial responsibility for resolving questions of state law, including the proper

---

[4]Following this reasoning, we have on numerous occasions construed the California Constitution as providing greater protection than that afforded by parallel provisions of the United States Constitution. A partial listing of such holdings includes: *People v. Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] (protection against self-incrimination); *People v. Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203] (right to speedy trial); *Serrano v. Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (equal protection); *People v. Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272] (protection against self-incrimination); *People v. Longwill* (1975) 14 Cal.3d 943 [123 Cal.Rptr. 297, 538 P.2d 753] (search of arrestees); *People v. Brisendine, supra,* 13 Cal.3d 528 (same); *Curry v. Superior Court* (1970) 2 Cal.3d 707 [87 Cal.Rptr. 361, 470 P.2d 345] (double jeopardy); *Cardenas v. Superior Court* (1961) 56 Cal.2d 273 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371] (same); *People v. Martin* (1955) 45 Cal.2d 755 [290 P.2d 855] (vicarious exclusionary rule).

interpretation of provisions of the state Constitution. [Citations.] In fulfilling this difficult and grave responsibility, we cannot properly relegate our task to the judicial guardians of the federal Constitution, but instead must recognize our personal obligation to exercise independent legal judgment in ascertaining the meaning and application of state constitutional provisions."[5]

It is from this perspective that we must analyze plaintiffs' claims that the statutes in question are invalid under the California Constitution.

3. *Although the state has no constitutional obligation to provide medical care to the poor, a long line of California decisions establishes that once the state has decided to make such benefits available, it bears a heavy burden of justification in defending any provision which withholds such benefits from otherwise qualified individuals solely because they choose to exercise a constitutional right.*

In analyzing the constitutionality of the challenged statutory scheme, we start from the premise, not challenged by the Attorney General, that under article I, section 1 of the California Constitution all women in this state—rich and poor alike—possess a fundamental constitutional right to choose whether or not to bear a child. Our court first recognized the existence of this constitutional right of procreative choice in *People v. Belous* (1969) 71 Cal.2d 954 [80 Cal.Rptr. 354, 458 P.2d 194], four years before the United States Supreme Court in *Roe v. Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705] acknowledged the existence of a comparable constitutional right under the federal Constitution.

In 1972, moreover, the people of this state specifically added the right of "privacy" to the other inalienable rights of individuals enumerated in article I, section 1 of the state Constitution.[6] The federal constitutional right of privacy, by contrast, enjoys no such *explicit* con-

---

[5]In 1972, the people adopted article I, section 24, of the California Constitution which provides that the rights "guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." This declaration of constitutional independence, as we stressed in *People v. Brisendine, supra,* 13 Cal.3d 528, 551, "did not originate at [the] election; indeed the voters were told the provision was a mere reaffirmation of existing law."

[6]Article I, section 1 (as reworded by constitutional amendment in 1974) presently provides: "All people are by nature free and independent and have certain inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety, happiness and privacy."

stitutional status. Consequently, in *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436], this court recently refused to rely on federal precedent to restrict the ambit of the California right of privacy. The federal right, we noted, "appears to be narrower than what the voters approved in 1972 when they added 'privacy' to the California Constitution." (27 Cal.3d at p. 130, fn. 3.)

■ The Attorney General concedes that under article I, section 1 the state has no authority directly to prohibit rich or poor women from exercising their right of procreative choice as they see fit. He argues, however, that the state violates no constitutional precept when it does not directly prohibit the protected activity but simply declines to extend a public benefit—in this case publicly funded medical care—to those who choose to exercise their constitutional right in a manner the state does not approve and does not wish to subsidize.

This court faced a nearly identical legal contention in a different factual context over 30 years ago in *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885]. In *Danskin* the state had established a general program under which private organizations were permitted to utilize public school buildings for public meetings, but had structured the program so as to exclude "subversive elements" from the use of such school property. In defending the statutory scheme, the government argued, as the Attorney General does here, that since the state was under no constitutional obligation to make school buildings available to private organizations, it was free to permit or withhold access to such facilities as it saw fit in order to avoid "subsidizing" the exercise of subversive ideas it did not wish to encourage.

In *Danskin*, Justice Traynor—writing for the court—rejected the state's argument in no uncertain terms: "The state is under no duty to make school buildings available for public meetings. [Citations.] If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings. [Citations.] Nor can it make the privilege of holding them dependent on conditions that would deprive any members of the public of their constitutional rights. A state is without power to impose an unconstitutional requirement as a condition for granting a privilege even though the privilege is use of state property. [Citations.] [¶] Since the state cannot compel 'subversive elements' directly to renounce their convictions and affiliations, it cannot make such a renunciation a condition of receiving the privilege of free assembly in a school building." (28 Cal.2d at pp. 545-546.)

In the more than three decades that have passed since the *Danskin* decision, both this court and the California Courts of Appeal have applied the legal principles underlying *Danskin* in a wide variety of factual settings, involving a host of different "public benefit" programs which conditioned the receipt of benefits on the waiver or forfeiture of a broad range of constitutional rights. As these numerous decisions teach, the *Danskin* principles apply whether the public benefit program at issue is access to a public forum,[7] public employment,[8] welfare benefits,[9] public housing,[10] unemployment benefits[11] or the use of public property[12] and whether the constitutional right singled out for discriminatory treatment is the right of free speech,[13] or, as in this case, the right of privacy.[14] In these varying contexts, California courts have repeatedly rejected the argument that because the state is not obligated to provide a general benefit, it may confer such a benefit on a selective basis which excludes certain recipients solely because they seek to exercise a constitutional right.[15]

---

[7]See e.g., *Danskin, supra*, 28 Cal.2d 536; *American Civil Liberties Union* v. *Board of Education* (1961) 55 Cal.2d 167 [10 Cal.Rptr. 647, 359 P.2d 45, 94 A.L.R.2d 1259]; *Wirta* v. *Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982].

[8]See, e.g., *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385]; *Kinnear* v. *City etc. of San Francisco* (1964) 61 Cal.2d 341 [38 Cal.Rptr. 631, 392 P.2d 391]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409]; *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 561 [55 Cal.Rptr. 505, 421 P.2d 697]; *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961]; *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]; *Finot* v. *Pasadena City Bd. of Education* (1967) 250 Cal.App.2d 189 [58 Cal.Rptr. 520].

[9]See, e.g., *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260 [57 Cal.Rptr. 623, 425 P.2d 223].

[10]See, e.g., *Housing Authority* v. *Cordova* (1955) 130 Cal.App.2d Supp. 883 [279 P.2d 215]; *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89 [130 Cal.Rptr. 375].

[11]See, e.g., *King* v. *Unemployment Ins. Appeals Bd.* (1972) 25 Cal.App.3d 199 [101 Cal.Rptr. 660]; *Thornton* v. *Department of Human Resources Dev.* (1973) 32 Cal. App.3d 180 [107 Cal.Rptr. 892].

[12]See, e.g., *Binet-Montessori, Inc.* v. *San Francisco Unified School Dist.* (1979) 98 Cal.App.3d 991 [160 Cal.Rptr. 38].

[13]See, e.g., *Danskin, supra*, 28 Cal.2d 536; *Vogel, supra*, 68 Cal.2d 18.

[14]See, e.g., *Parrish, supra*, 66 Cal.2d 260; *City of Carmel-By-the-Sea, supra*, 2 Cal.3d 259; *Finot, supra*, 250 Cal.App.2d 189; *King, supra*, 25 Cal.App.3d 199; *Thornton, supra*, 32 Cal.App.3d 180.

[15]We have not, of course, held that the government may *never* condition the receipt of benefits or privileges upon the nonassertion of constitutional rights. Rather, as we explained in *Bagley* v. *Washington Township Hospital Dist., supra*, 65 Cal.2d 499, 505: "Just as we have rejected the fallacious argument that the power of government to impose such conditions knows no limit, so must we acknowledge that government may,

Our decision in *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499 served as a touchstone for many of these crucial precedents. (See, e.g., *Vogel, supra,* 68 Cal.2d 18; *Parrish, supra,* 66 Cal.2d 260; *City of Carmel-by-the-Sea, supra,* 2 Cal.3d 259; *Finot, supra,* 250 Cal.App.2d 189.) In *Bagley,* plaintiff, a nurse's aide employed by the defendant hospital district, was discharged when she refused to discontinue her off-duty pamphletting and petition circulating activities in support of an election campaign to recall several of the hospital district's directors. The district defended the discharge by reference to a Government Code section which provided broadly that "[n]o . . . employee . . . of a local agency . . . shall take an active part in any campaign . . . for or against any ballot measure relating to the recall of any elected official of the local agency." (Former Gov. Code, § 3205.) In *Bagley,* our court rejected the district's defense and struck down the statute on constitutional grounds.

In reaching our conclusion in *Bagley,* we drew upon the cited prior holdings involving conditional benefit programs and on scholarly legal commentaries[16] to construct a framework for judicial analysis of restrictions, like those here at issue, which exclude from government benefit programs potential recipients solely on the basis of their exercise of constitutional rights. Stressing that the "government bears a heavy burden of demonstrating the practical necessity" for such unequal treatment (65 Cal.2d at p. 505), our court in *Bagley* established a three-part standard that the state must satisfy to justify such a scheme.

First, we held that "[the state] must establish that the imposed conditions relate to the purpose of the legislation which confers the benefit or privilege." (65 Cal.2d at pp. 505-506.) Second, we declared that "[n]ot only must the conditions annexed to the enjoyment of a publicly conferred benefit reasonably tend to further the purpose sought by conferment of that benefit, but also the utility of imposing the conditions must manifestly outweigh any resulting impairment of constitutional rights." (*Id.,* at p. 506.) Third, and finally, we established that "in imposing conditions upon the enjoyment of publicly conferred

when circumstances inexorably so require, impose conditions upon the enjoyment of publicly conferred benefits despite a resulting qualification of constitutional rights."

[16]See, e.g., O'Neil, *Unconstitutional Conditions: Welfare Benefits With Strings Attached* (1966) 54 Cal.L.Rev. 443; Linde, *Constitutional Rights in the Public Sector* (1965) 40 Wash.L.Rev. 10; Note, *Unconstitutional Conditions* (1960) 73 Harv.L.Rev. 1595; Willcox, *Invasions of the First Amendment Through Conditioned Public Spending* (1955) 41 Cornell L.Q. 12; Hale, *Unconstitutional Conditions and Constitutional Rights* (1935) 35 Colum.L.Rev. 321; Powell, *The Right to Work for the State* (1916) 16 Colum.L.Rev. 99.

benefits, as in the restriction of constitutional rights by more direct means, the state must establish the unavailability of less offensive alternatives and demonstrate that the conditions are drawn with narrow specificity, restricting the exercise of constitutional rights only to the extent necessary to maintain the integrity of the program which confers the benefits." (*Id.*, at p. 507.)

In attempting to avoid the analytical scrutiny mandated in California by the *Danskin-Bagley* line of decisions, the Attorney General relies on the recent federal decision in *McRae.* The Attorney General is simply mistaken, however, in suggesting that the federal approach to unconstitutional conditions corresponds to the California standard established by the *Danskin-Bagley* line of cases. Indeed, a comparison of several recent California and United States Supreme Court decisions demonstrates quite vividly the divergence between state and federal constitutional doctrine in this realm.

In *Parrish v. Civil Service Commission, supra,* 66 Cal.2d 260, for example, this court applied the *Bagley* standard in evaluating the constitutionality of a government practice of conditioning the receipt of welfare benefits upon a recipient's waiver of his constitutional right of privacy in his home. Because the government could not satisfy the *Bagley* test, we held the practice unconstitutional. In *Wyman v. James* (1971) 400 U.S. 309 [27 L.Ed.2d 408, 91 S.Ct. 381], by contrast, the United States Supreme Court subjected a similar governmental intrusion upon the rights of welfare recipients to a lesser degree of scrutiny, and—contrary to our *Parrish* decision—upheld the government policy against constitutional challenge.

Similarly, in *Wirta v. Alameda-Contra Costa Transit Dist., supra,* 68 Cal.2d 51, our court, applying the principles of *Danskin* and *Bagley,* struck down a discriminatory public transit advertising policy which made advertising space on public buses available for commercial expression but denied this "public benefit" to those who wished to advertise their views upon noncommercial, political subjects. In *Lehman v. City of Shaker Heights* (1974) 418 U.S. 298 [41 L.Ed.2d 770, 94 S.Ct. 2714], however, the United States Supreme Court, when faced with the identical issue presented in *Wirta,* declined to engage in the demanding scrutiny called for by the California precedents and sustained the unequal advertising policy under the federal Constitution.

Finally, our court, in *Bagley* itself and in *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385], tested the constitutionality of limitations on the political activities of public employees by stringent standards and found broadly worded restrictions on such activities to be unconstitutional. In *United States Civil Serv. Comm'n* v. *National Ass'n of Letter Carriers* (1973) 413 U.S. 548 [37 L.Ed.2d 796, 93 S.Ct. 2880], however, the United States Supreme Court applied a less demanding standard and upheld comparably broad restrictions on political activities of federal employees.

As these cases indicate, for at least the past decade the federal decisions in this area have not been a reliable barometer of the governing California constitutional principles. Indeed, an examination of *McRae* itself plainly demonstrates that the *McRae* majority, in refusing to closely scrutinize the discriminatory Medicaid funding scheme, relied on factors which have no bearing on our task in applying California law.

First, the *McRae* court conceptualized the selective funding program as placing no additional "obstacles in the path of a woman's exercise of her freedom of choice" (448 U.S. at p. 316 [65 L.Ed.2d at p. 804, 100 S.Ct. at p. 2688]) but simply leaving "an indigent woman with at least the same range of choices in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all." (*Id.*) This reasoning, which was central to the *McRae* decision, cannot be reconciled with the analysis adopted in the *Danskin-Bagley* line of decisions.[17]

In *Danskin* itself, for example, the government, by providing a public forum for nonsubversive groups, did not place any additional obstacle in the path of subversive groups who wanted to hold meetings in private buildings, public parks, or any other previously available forum. Nonetheless, our court held that the discriminatory aspect of the government's benefit program rendered it unconstitutional. Similarly, in *Parrish*, the condition which was placed on the receipt of welfare benefits posed no additional threat to the privacy rights of those who did not

---

[17]Indeed, recent academic commentaries on the *McRae* decision have criticized the majority's conclusion on the ground that the ruling is incompatible with the prior federal unconstitutional condition precedents. (See, e.g., Note, *The Supreme Court, 1979 Term* (1980) 94 Harv.L.Rev. 75, 96-107. See also Perry, *Why the Supreme Court Was Plainly Wrong in the Hyde Amendment Case: A Brief Comment on Harris v. McRae* (1980) 32 Stan.L.Rev. 1113.)

seek such benefits; we recognized, however, that the limitation would, in fact, impair the constitutional rights of would-be recipients and accordingly tested it by the standard announced in *Bagley*.

Indeed, the entire *Danskin-Bagley* doctrine is concerned solely with the validity of conditional prerequisites for the receipt of various benefits which the government has no obligation to provide. In all of these cases, it may be said that the limitation or condition at issue creates no "additional" obstacle to the exercise of rights, for a recipient unhappy with any such condition is always free—at least theoretically—to go without the public benefit in question. The California courts, however, have acknowledged both the practical importance of many governmental benefits to individual recipients and the corresponding likelihood that a discriminatory benefit program will effectively nullify important constitutional rights. Thus, California holdings uniformly confirm that the absence of an "additional obstacle" to the exercise of one's constitutional rights does not eliminate the government's burden of demonstrating the propriety of the condition or limitation under the *Bagley* test.

The Attorney General finds dictum in *McRae* on which he erects two additional arguments against our reliance upon the California doctrine of unconstitutional conditions. First, he argues that we should draw a distinction between a measure which denies other governmental benefits to women who choose to have an abortion and one which simply denies funding for the abortion itself.[18] The former measure, he suggests, imposes an unconstitutional penalty; the latter merely withholds funding for actions which the state does not want to subsidize.

The proffered distinction does not conform to California precedent. In *Danskin* itself, for example, the challenged provisions did not broadly disqualify subversive elements from a wide range of benefits, but rather withheld a single benefit—the use of public schools as a forum— from those who wanted to use those facilities to exercise constitutional rights the state did not desire to subsidize. Similarly, under the California cases, the state could not escape application of the *Bagley* standard

---

[18]Although the *McRae* majority upheld restrictions which denied poor women federal Medicaid funds for abortion, the majority opinion notes that "[a] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion." (448 U.S. at p. 317, fn. 19 [65 L.Ed.2d at p. 805, 100 S.Ct. at p. 2688].)

if, instead of denying all welfare benefits to recipients who marry someone of another race, the state provided free marriages for poor intraracial couples but declined to extend that "single benefit" to poor interracial couples. (See *The Supreme Court, 1976 Term* (1977) 91 Harv.L.Rev. 70, 144. See also *Binet-Montessori, Inc. v. San Francisco Unified School Dist., supra*, 98 Cal.App.3d 991, 995.) Under *Danskin-Bagley* principles, whenever the state conditions the receipt of a benefit upon the waiver of a constitutional right or discriminatorily withholds such a benefit from individuals who exercise such right, the state must demonstrate the propriety of the condition in terms of the governing three-part test.

The Attorney General also draws upon *McRae's* analogy (see 448 U.S. at p. 318 [65 L.Ed.2d at p. 805, 100 S.Ct. at pp. 2688-2689]) between the state's decision to fund childbirth but not abortion and its decision to fund public education but not "private education." In the decisions recognizing a constitutional right to obtain a private education upon which the ostensible analogy rests, however, the principal question presented was whether the state could compel all children to attend state-run schools; these decisions concluded that the state could not. (See, e.g., *Pierce v. Society of Sisters* (1925) 268 U.S. 510 [69 L.Ed. 1070, 45 S.Ct. 571, 39 A.L.R. 468].) An analogous medical care case would arise if a state law requiring, for example, that all medical care be obtained from a public hospital clashed with an individual's asserted constitutional right to reject state-provided medical care in favor of medical care that he himself chooses. In the present case, of course, no such constitutional right is at issue because the statutory scheme in question does not interfere with an individual's right to go elsewhere for medical care.

Thus, the Attorney General's attempted analogy is misleading. It is obvious, of course, that the state, in providing a benefit such as public education, is not thereby compelled to pay the costs incurred by those who choose to relinquish the public benefit in favor of a comparable privately funded benefit. *Danskin* itself, for example, does not suggest that the state in making public schools available as a public forum, obligated itself to reimburse those who chose to exercise their First Amendment right by speaking in *private* meeting halls or, indeed, by refraining from speaking at all.

In short, the *Danskin-Bagley* line of cases is not concerned with a person's liberty to reject an offered public benefit in favor of a private

counterpart—the issue in the private school cases. Instead, *Danskin* and *Bagley* hold that when the state implements a general public benefit program, the California Constitution imposes definite limitations on the state's ability to offer such a benefit in a fashion which discriminates against the exercise of constitutional rights. The statutory program at issue here does afford medical care on just such a selective or discriminatory basis.[19]

Accordingly, in evaluating the constitutionality of the challenged statutory provisions under the California Constitution, we employ the test established by the California unconstitutional condition cases.

4. *Under the constitutional standard established in Bagley, the statutory provisions which discriminatorily deny generally available medical benefits to poor women solely' because they choose to have an abortion are unconstitutional.*

■ As noted previously, *Bagley* posits a threefold inquiry: (1) whether the conditions which are imposed relate to the purposes of the legislation which provide the benefit; (2) whether the utility of the conditions imposed clearly outweighs the resulting impairment of constitutional rights; and (3) whether there are no less offensive alternatives available to achieve the state's objective. We follow these avenues of inquiry, placing particular emphasis upon the second prong of the test in which we must weigh the utility of the funding restrictions against the resulting impairment to the woman's right of procreative choice.

---

[19]The state cannot rebut this conclusion by attempting to portray the program as one that does not provide general medical care but rather reimburses only specified medical expenses, such as those for childbirth, while' withholding funds for other medical expenses, such as those for abortion. In the first place, the breadth of the Medi-Cal program belies any suggestion that the state in this case is affording only the specialized benefit of medical expense for childbirth. As we have noted, under Medi-Cal the state pays for virtually all necessary medical expenses of the poor, and does not confine its funding only to childbirth expenses.

Moreover, it is obvious that the state cannot circumvent the principles of the *Danskin-Bagley* doctrine by defining the benefit offered in a constitutionally discriminatory fashion. Thus, for example, the result in *Danskin* clearly would not have differed if the state had announced that it was making public schools available solely for patriotic meetings. (Cf. *Wirta* v. *Alameda-Contra Costa Transit Dist., supra*, 68 Cal.2d 51.) Similarly, the *Bagley* analysis could not be avoided by a hospital district's declaration that it has an opening for the position of "apolitical nurse's aide." Contrary to the dissent's reasoning (see p. 298, *post*), the foregoing examples are not rendered constitutionally palatable simply because "*everyone*" would be free to make patriotic speeches or because "*everyone*" would be permitted to apply for the apolitical nurse's aide job.

(a) *The restrictions imposed on poor women's right of procreative choice do not relate to the purposes of the Medi-Cal program.*

As noted above, *Bagley* provides that, as an initial matter, the state "must establish that the imposed conditions relate to the purposes of the legislation which confers the benefit or privilege." (65 Cal.2d at pp. 505-506.) Elaborating on this requirement in *Bagley*, we quoted with approval Justice Frankfurter's observation that "Congress may withhold all sorts of facilities for a better life, but if it affords them it cannot make them available in an obviously arbitrary way *or exact surrender of freedoms unrelated to the purpose of the facilities.*" (Italics added.) (*American Communication Assn.* v. *Douds* (1950) 339 U.S. 382, 417 [94 L.Ed. 925, 70 S.Ct. 674] (separate opinion).)

In most of the California public benefit cases, the restrictions on constitutional rights adopted as part of the government programs have borne at least some relation to the purpose of the program. Thus, for example, in cases such as *Bagley* that involved restrictions on the exercise of First Amendment activities by those who obtain the "benefit" of public employment, the restrictions were apparently intended to curtail activities thought to have a potential for interfering with the effective performance of the public employee's job. Similarly, in *Parrish*, the restrictions imposed on welfare recipients' right of privacy related to the elimination of fraud in the welfare system and thus again could be said to further the aims of the benefit program in question.

In the instant case, by contrast, the restriction imposed on poor women who seek to exercise their constitutional right to decide whether or not to have a child bears no relation whatsoever to the fundamental purposes of the Medi-Cal program. Welfare and Institutions Code section 14000 declares that "[t]he purpose [of the Medi-Cal program] is to afford health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons...";[20] thus, the program's primary objective is to alleviate the

---

[20]Section 14000 provides in full: "The purpose of this chapter is to afford health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons, including related social services which are necessary for those receiving health care under this chapter.

"The intent of the Legislature is to provide, to the extent practicable, through the provisions of this chapter, for health care for those aged and other persons, including family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care

hardship and suffering incurred by those who cannot afford needed medical care by enabling them to obtain such medical treatment. The restrictions at issue here directly impede this fundamental purpose. Even when an abortion represents the appropriate medical treatment for a poor pregnant woman, the statute virtually bars payment for that treatment and thus subjects the poor woman to significant health hazards and in some cases to death.[21]

In this respect, the state's denial of Medi-Cal funds to otherwise qualified women solely because they choose to have an abortion bears a marked similarity to the Los Angeles Housing Authority's policy of

---

would jeopardize the person or family's future minimum self-maintenance and security. It is intended that whenever possible and feasible:

"(a) The means employed shall be such as to allow, to the extent practicable, eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability.

"(b) The benefits available under this chapter shall not duplicate those provided under other federal or state laws or under other contractual or legal entitlements of the person or persons receiving them.

"(c) In the administration of this chapter and in establishing the means to be used, the department shall give due consideration both to the appropriate organization and to the ready accessibility and availability of the facilities and resources for health care to persons eligible under this chapter, and to new and innovative approaches to the delivery of health care services."

[21]The trial court in *McRae* (*McRae* v. *Califano* (E.D.N.Y. 1980) 491 F.Supp. 630) conducted a lengthy factual hearing with extensive medical evidence and concluded that the federal funding restrictions, which are comparable to those under the California Budget Act, hazard the woman's life and health in a variety of ways. The comparable California Budget Act restrictions, we conclude, pose the same hazards to the health of indigent California women. Specifically:

(1) The act permits funding of abortions "[w]here the life of the mother would be endangered if the fetus were carried to full term." (Stats. 1979, ch. 259, item 261.5(a), p. 87.) The phrase "would be endangered," however, is vague—so vague that we held similar language unconstitutional in *People* v. *Belous, supra*, 71 Cal.2d 954. If interpreted to require a substantial certainty or even a reasonable probability of death, it excludes funding in many cases in which the risk of death is sufficient to induce a physician to recommend abortion.

(2) The act also permits abortion "[w]here severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term." That language by necessary implication excludes cases in which the damage cannot be described as both severe and long lasting. It also excludes damage to mental health regardless of severity and duration.

(3) A denial of funding will induce some women to attempt abortion without medical assistance, a procedure which carries an extreme risk of injury or death. (See *People* v. *Belous, supra*, 71 Cal.2d at pp. 965-966.)

(4) A denial of funding will induce some women to delay abortion until they can somehow raise the money to pay for a private abortion, although abortions later in pregnancy present a greater risk to life and health.

(5) The denial of funding will induce some women to carry the child to term even though relevant medical considerations—one of which may be the psychological impact of carrying an unwanted child—make childbirth much more risky than abortion.

excluding so-called subversive persons from public-supported low-rent housing projects, a policy that was invalidated by a California decision over 25 years ago in *Housing Authority* v. *Cordova* (1955) 130 Cal. App.2d Supp. 883 [279 P.2d 215]. In finding that exclusionary policy unconstitutional, the *Cordova* court explained: "'The purpose of the [housing act] is to eradicate slums and provide housing for persons of low-income class. [Citation.] It is evident that the exclusion of otherwise qualified persons solely because of membership in organizations designated as subversive by the Attorney General has no tendency whatever to further such purpose.'" (130 Cal.App.2d Supp., at p. 888.)

The state can show a relationship between the Budget Act limitations and the purpose of the Medi-Cal program only by claiming that Medi-Cal seeks not only to provide necessary health care to indigents but also to protect the life and health of the fetus. Any attempt to reconcile Medi-Cal objectives with abortion limitations on the theory that the latter protect the fetus, however, impermissibly denigrates the woman's right of choice.

As we explain in discussing the second part of the *Bagley* test, both California and federal authorities establish that, at least prior to viability, the state may not subordinate a woman's own medical interests or her right of procreative choice to the interests of the fetus. We therefore turn to consider the second part of the *Bagley* test.

(b) *In light of the fundamental and intimate nature of the constitutional right of procreative choice and the severe impairment of that right that will in practice result from the statutory restrictions at issue, the utility of imposing such restrictions does not "manifestly outweigh [the] resulting impairment of constitutional rights."*

Under the second part of *Bagley*, the state must demonstrate that "the utility of imposing the conditions...manifestly outweigh[s] any resulting impairment of constitutional rights." (65 Cal.2d at p. 506.) As numerous cases since *Bagley* have elaborated, a court in undertaking this "weighing" or "balancing" process must realistically assess the importance of the state interest served by the restrictions and the degree to which the restrictions actually serve such interest; further the court must carefully evaluate the importance of the constitutional right at stake and gauge the extent to which the individual's ability to exercise that right is threatened or impaired, as a practical matter, by the

specific statutory restrictions or conditions at issue. (See, e.g., *Parrish v. Civil Service Commission, supra*, 66 Cal.2d 260, 270-274; *City of Carmel-by-the-Sea v. Young, supra*, 2 Cal.3d 259, 265-272; *Finot v. Pasadena City Bd. of Education, supra*, 250 Cal.App.2d 189, 196-202.) We must canvass the various factors on each side of the scale in order to determine whether the utility of the restrictions "manifestly outweighs" the resulting impairment of constitutional rights. (See generally O'Neil, *op. cit. supra*, 54 Cal.L.Rev. 443, 460-478; Comment, *Another Look at Unconstitutional Conditions* (1968) 117 U.Pa.L.Rev. 144.)

In undertaking this analysis, we begin by examining the nature and importance of the constitutional right at issue, and then consider the degree to which this right is actually threatened by the challenged statutory scheme. In *People v. Belous, supra*, 71 Cal.2d 954, the seminal California case in this area, we recognized that the constitutional rights at stake are in essence twofold: "The rights involved...are the woman's rights to life and to choose whether to bear children." (*Id.*, at p. 963.) The first right is implicated because the choice between childbirth and abortion in some instances involves potential risks to the life of the pregnant woman. Moreover, even when a life-threatening condition is not present, the constitutional choice directly involves the woman's fundamental interest in the preservation of her personal health. As this court stated in *Ballard v. Anderson* (1971) 4 Cal.3d 873, 879 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]: "In California, law and medicine recognize that therapeutic abortion is a legitimate medical treatment which may be necessary for the preservation of a pregnant woman's life and health."

Closely related to this fundamental interest in life and health is the basic recognition that, for a woman, the constitutional right of choice is essential to her ability to retain personal control over her own body. As Professor Tribe has observed: "If a man is the involuntary source of a child—if he is forbidden, for example, to practice contraception—the violation of his personality is profound; the decision that one wants to engage in sexual intercourse but does not want to parent another human being may reflect the deepest of personal convictions. But if a woman is forced to bear a child—not simply to provide an ovum but to carry the child to term—the invasion is incalculably greater.... [I]t is difficult to imagine a clearer case of bodily intrusion, even if the original conception was in some sense voluntary." (Tribe, American Constitutional Law (1977) § 15-10, p. 924.)

■ Moreover, as *Belous* makes clear, the restriction at issue undermines the right of privacy guaranteed under our California Constitution in that it threatens not only the woman's interests in life, health, and personal bodily autonomy but also her right to decide for herself whether to parent a child: "The fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgment of a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex." (71 Cal.2d at p. 963.)

The Supreme Court has defined the woman's right to choose as an aspect of the privacy right in even more explicit terms: "[I]f the right of privacy means anything, it is the right of the *individual*...to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (Original italics.) (*Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453 [31 L.Ed.2d 349, 362, 92 S.Ct. 1029].) This right of personal choice is central to a woman's control not only of her own body, but also to the control of her social role and personal destiny. (See Karst, *The Supreme Court, 1976 Term—Forward Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1, 57-58.) As Professor Karst has recently observed: "The implications of an unwanted child for a woman's education, employment opportunities and associational opportunities (often including marriage opportunities) are of enormous proportion." (Karst, *The Freedom of Intimate Association* (1980) 89 Yale L.J. 624, 641, fn. 90.)

■ Thus, the constitutional rights at issue here are clearly among the most intimate and fundamental of all constitutional rights. With that understanding in mind, we must consider the extent to which the statutory limitations in controversy will actually impair the individual's exercise of these vitally important constitutional rights.

In resolving that issue, we need only consider the nature of the program in question to recognize that the actual impairment of constitutional rights will be severe indeed. The medical benefits provided by the Medi-Cal program are available only to poor persons who are unable to pay for their own health care; by definition, then, the only women affected by the restrictions at issue are those who lack the money or resources to pay for a medically supervised abortion on their own. Although it may be possible for some poor women to obtain medical abortions with the help of private charities, the existence of the

Medi-Cal program itself testifies to the fact that private charitable resources do not suffice to meet the medical needs of the poor. Thus, from a realistic perspective, we cannot characterize the statutory scheme as merely providing a public benefit which the individual recipient is free to accept or refuse without any impairment of her constitutional rights. On the contrary, the state is utilizing its resources to ensure that women who are too poor to obtain medical care on their own will exercise their right of procreative choice only in the manner approved by the state.

In this respect, the impairment of constitutional rights resulting from the present statutory restrictions .is significantly greater than the impairment of rights involved in almost all the past California cases in this field. In *Danskin*, for example, while the discriminatory benefit scheme denied disfavored persons the use of public school buildings for meetings, it did not effectively *preclude* them from holding meetings or disseminating their views to the public. Similarly, although the restrictive government employment policy in *Bagley* directly impinged upon the public employee's free speech rights in significant respects, it nonetheless left the employee free to engage in much political activity. In the instant case, by contrast, the state's discriminatory treatment will prevent the vast majority of poor women from exercising their constitutional right to choose whether or not to bear a child. As Justice Brennan has observed, "By funding all of the expenses associated with childbirth and none of the expenses incurred in terminating pregnancy, the government literally makes an offer that the indigent woman cannot afford to refuse." (*McRae*, 448 U.S. at pp. 333-334 [65 L.Ed.2d at p. 815, 100 S.Ct. at p. 2704] (dis. opn.).)

Having found that the statutory restrictions in question will severely impair or totally deny the actual exercise of this intimate and fundamental constitutional right, we must determine whether the benefits which the state derives from the restrictions "manifestly outweigh" such significant impairment. Obviously, in view of the foregoing discussion, only the most compelling of state interests could possibly satisfy this test. As we shall see, however, it is doubtful whether the restrictions in this case serve any constitutionally legitimate, let alone compelling state interest; furthermore, the interest that the statute does serve is furthered in an underinclusive and discriminatory manner.[22]

---

[22]Our analysis at this point closely parallels the strict judicial scrutiny used to determine whether an enactment which discriminates against the exercise of a fundamental

We begin by identifying the precise state interest that is served by the statutory restrictions at issue. We note that although the restrictions take the form of curtailing state expenditures, they do not in reality serve the state's legitimate interest in conserving its limited fiscal resources; whatever money is saved by refusing to fund abortions will be spent many times over in paying maternity care and childbirth expenses and supporting the children of indigent mothers.[23] In the first place, the cost of an abortion is much less than the cost of maternity care and delivery.[24] Thus, the present statutory scheme, by withholding funds for abortions, requires the state to pay the more expensive childbirth expenses for every poor woman or teenager who becomes pregnant.[25]

Second, because the present statutes frequently deny funding of abortions to women who face special medical risks if they carry a fetus to term, such limitations—under the current comprehensive Medi-Cal scheme—will oblige the state to provide additional and often expensive medical care for such women before, during, and after childbirth. But for the challenged restrictions, such expenses would not have been incurred. Finally, this limitation on poor women's constitutional rights will prove enormously expensive in terms of long-range economic costs. As Justice Blackmun has observed: "[T]he cost of a[n]...abortion ...holds no comparison whatsoever with the welfare costs that will bur-

right denies equal protection of the law. Because the state cannot demonstrate that the statutory scheme is supported by a compelling state interest, we believe that the statutes in question are additionally unconstitutional under established equal protection principles. In light of the similarity of the applicable principles in this context, however, we see no need to undertake a separate analysis of the statutes' equal protection defects.

[23]In *Williams* v. *Zbaraz* (1980) 448 U.S. 358 [65 L.Ed.2d 831, 100 S.Ct. 2694], a companion case to *McRae*, it was estimated that funding restrictions similar to those at issue here would impose upon the State of Illinois an additional cost "of about *$20,000,000 per year.*" (See 448 U.S. at p. 355, fn. 9 [65 L.Ed.2d at p. 829, 100 S.Ct. at p. 2715] (dis. opn. by Stevens, J.).) Because the population of California is significantly greater than that of Illinois, the added costs would presumably be much higher.

[24]The dissenting opinion asserts that we overlook a third procreative choice available to the indigent woman—avoiding pregnancy. For the woman who is already pregnant, of course, that choice is unavailable, whether her pregnancy resulted from intentional act, carelessness, ignorance of contraceptive methods, or contraceptive failure. Perhaps in an ideal world no woman who does not want a child would ever become pregnant, and nothing would ever happen after conception to change matters, but that utopian vision is no comfort to the persons whose constitutional freedom of choice is affected by the restrictions on abortion funding.

[25]In the *Zbaraz* case (see fn. 23, *ante*), the trial court found that the average cost to the State of Illinois of an abortion was less than $150, while the average cost of childbirth exceeded $1,350. (See 448 U.S. at p. 355, fn. 9 [65 L.Ed.2d at p. 829, 100 S.Ct. at p. 2715] (dis. opn. of Stevens, J.).)

den the State for the new indigents and their support in the long, long years ahead." (*Beal* v. *Doe* (1977) 432 U.S. 438, 463 [53 L.Ed.2d 464, 483, 97 S.Ct. 2366] (dis. opn.).)[26]

The Attorney General and amici suggest, however, that the restrictions on the funding of abortions through Medi-Cal relate to a state interest alternatively defined as an interest in "encouraging childbirth" or an interest in "protecting the potential life of the fetus." As far as the interest in "encouraging childbirth" is concerned, the California Legislature has not embraced a general policy of encouraging *unwanted* children; under the present provisions of the Medi-Cal program, for example, funds are specifically authorized to pay for the medical expense of contraception and sterilization. Furthermore, as we explain in the following section, to the extent that the challenged provisions are defended as simply a method of aiding poor women who want to bear children, the provisions clearly do not serve that interest in a manner least offensive to the rights of women who choose not to bear children.

That brings us to the state interest in "protecting the potential life of the fetus," an objective which we think does realistically underlie the

---

[26]Ironically, the Supreme Court decision in *McRae*, filed in June 1980, supplies for the 1980 California Budget Act a conceivable economic justification that did not apply to the 1978 and 1979 acts. The 1980 Budget Act abortion funding restrictions, as we have noted, will substantially increase total government outlay, because childbirth is much more expensive than abortion. As a result of the *McRae* decision upholding the Hyde Amendment, however, some of those increased costs will shift from the state to the federal taxpayer; under *McRae*, federal funds are no longer available to subsidize state abortion payments, but remain available to subsidize state maternity and childbirth payments.

The state's interest in shifting expenditures to the federal fisc, however, can hardly be described as a significant one. In the first place, the California taxpayer is also a federal taxpayer, and derives no benefit when money is taken from one pocket instead of another. Second, taking into account not only the required state contribution to maternity and childbirth expenses under Medi-Cal but also the substantial expense of providing state support for unwanted minors, the Budget Act restrictions will ultimately cost the California taxpayer more than would abortion funding. The serious impairment of a fundamental right inflicted by the abortion funding limitations cannot be justified on so flimsy a basis.

The Attorney General also suggests that the Budget Act provisions reflect the state's desire to accommodate those taxpayers who are conscientiously opposed to abortion. The antagonism of taxpayers toward the exercise of a constitutional right, of course, in no way justifies state discrimination against persons who exercise that right. If the Attorney General is suggesting that the state could accommodate objecting taxpayers by allocating their taxes to other state purposes, the short answer is that the Budget Act enacts no such allocation; it bars funding of abortions from all revenue sources whatever, including taxpayers who favor funding of abortions and those who are indifferent on the matter.

funding restrictions at issue here. There is no question, of course, that phrased in general terms the state has a legitimate interest in protecting the potential life of a fetus. Thus, the state may without doubt legitimately prosecute a person who deliberately injures a fetus, even if no corresponding harm befalls the woman who carries the fetus. In the instant case, however, the state is not merely proposing to protect a fetus from general harm, but rather is asserting an interest in protecting a fetus vis-à-vis the woman of whom the fetus is an integral part. Such a claimed interest, of course, clashes head-on with the woman's own fundamental right of procreative choice.

The argument that the state advances here essentially parallels that presented to the United States Supreme Court in *Roe* v. *Wade, supra,* 410 U.S. 113, when the State of Texas argued that its asserted interest in protecting the fetus justified criminal proscriptions on abortion. The high court carefully examined and weighed the interests implicated by this contention: the woman's interest in deciding for herself a matter which so intimately and fundamentally affects her future life and happiness; her interest in protecting her own life and health; the corresponding state interest in safeguarding the woman's life and health; and, finally, the state's interest in protecting the fetus. After an extensive review of the history of abortion laws and consideration of the medical risks of abortion and childbirth, the court held that during the first two trimesters of pregnancy, when the fetus is not viable, the state's interest in protecting the fetus is not of compelling character. Consequently, the court concluded, the state may not subordinate the woman's fundamental right of procreative choice to the state's interest in protecting a nonviable fetus.

*Roe* v. *Wade* went on to explain the extent and purpose for which state regulation of abortion is permissible. Prior to the third trimester of pregnancy, it held, the state may regulate only to protect the woman's health—not to protect the fetus. In the third trimester the state may enact restrictions to protect the fetus, but may not proscribe abortions necessary to preserve the woman's life or health. (410 U.S. at pp. 164-165 [35 L.Ed.2d at p. 183].)

The restrictions of the California Budget Act do not conform to the careful calculation of competing rights and interests set out in *Roe* v. *Wade.* The Budget Act seeks to limit first and second trimester abortions, not for the permissible purpose of protecting the woman's health,

but to protect the fetus. The act thus inverts the priority of interests established in *Roe* and improperly subordinates the woman's right of choice to the lesser state interest in protecting. a nonviable fetus. Furthermore, although *Roe* v. *Wade* recognized a compelling interest in protecting a viable fetus, even that interest cannot be invoked to restrict abortions necessary to preserve the woman's health; the Budget Act, however, gives no consideration to danger to the woman's health unless the threatened harm is severe, long-lasting, and relates to physical health.

In short, *Roe* v. *Wade* settled that protection of a nonviable fetus is not a compelling state interest. The subsequent high court decision in *McRae* does not detract from that holding. *McRae* did not measure the restrictions at issue against a compelling interest test. Rather, the Supreme Court assumed that a discriminatory withholding of government benefits, because it imposes no new obstacle to abortion, required only minimal justification. That proposition, as we have explained, is inconsistent with California constitutional law. The assumption underlying the high court's analysis, however—that funding restrictions would fail if required to meet a compelling interest standard—provides further support for our decision today.

Neither do California decisions support the Attorney General's claim. We considered the state's asserted interest in protecting fetal life in *People* v. *Belous, supra*, 71 Cal.2d 954, holding unconstitutionally vague a statute which barred abortions unless necessary to preserve the mother's life. At the outset, we stressed that a woman's right to choose may be infringed only by regulations necessary to further a compelling interest. (See 71 Cal.2d at p. 964.) Although the state urged that it had "a compelling interest in the protection of the embryo and fetus and that such interest warrants the limitation on the woman's constitutional rights" (pp. 967-968), we replied that the asserted state interest derived from statutes and rules which either "require a live birth or reflect the interest of the parents." (*Id.*)

We have already noted that three years after *People* v. *Belous*, the people of California amended our state Constitution to provide explicit protection for the right of privacy, a protection not found in the federal text. We have noted also that the federal right of privacy, the foundation for the decision in *Roe* v. *Wade, supra*, 410 U.S. 113, is more

limited than the corresponding right in the California Constitution. (See *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123, 130, fn. 3.) We therefore conclude that the protection afforded the woman's right of procreative choice as an aspect of the right of privacy under the explicit provisions of our Constitution is at least as broad as that described in *Roe* v. *Wade.* Consequently, we further conclude that the asserted state's interest in protecting a nonviable fetus is subordinate to the woman's right of privacy.

Moreover, even if the state could assert a compelling interest in protecting a nonviable fetus, we would have grave doubts that the state could pursue such interest in the discriminatory fashion adopted here. Under the present statutory scheme, the state has not undertaken to protect the potential life of *all* fetuses by promoting their interests over the constitutional rights of all women. Instead, by implementing this state interest through restrictions on Medi-Cal funds rather than through more broadly applicable legislation, the state has singled out poor women and has subordinated only their constitutional right of procreative choice to the concern for fetal life.

In the past, this court has been particularly critical of statutory mechanisms that restrict the constitutional rights of the poor more severely than those of the rest of society. (See, e.g., *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 765-767 [135 Cal.Rptr. 345, 557 P.2d 929]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597-604 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; *In re Antazo* (1970) 3 Cal.3d 100, 108-112 [89 Cal.Rptr. 255, 473 P.2d 999].) Thus, we have implicitly recognized that the indigent poor share many characteristics of other "insular minorities" who may not be adequately protected from discriminatory treatment by the general safeguards of the legislative process. (See generally *U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144, 152-153, fn. 4 [82 L.Ed. 1234, 1241-1242, 58 S.Ct. 778].) Although prior cases have generally considered this factor in connection with equal protection analysis, Professor O'Neil has identified its relevance to the unconstitutional condition doctrine: limitations upon governmental benefits which apply to rich and poor alike are obviously less invidious than conditions, like those at issue here, in which the state effectively tells a poor woman "that because [she] is poor ... [she] must restrict [her exercise of constitutional rights] in ways that the government does not ask self-sufficient people to do." (O'Neil,

*Unconstitutional Conditions: Welfare Benefits With Strings Attached, supra*, 54 Cal.L.Rev. 443, 472.)[27]

From this review of the factors which enter into the *Bagley* analysis, we conclude that the alleged "benefits" which flow from the statutory restrictions on Medi-Cal funds in no sense "manifestly outweigh" the resulting impairment of constitutional rights. As we have seen, the state is hard-pressed to demonstrate that the restrictions further any constitutionally legitimate interests at all; at the same time, the restrictions effectively nullify the poor woman's fundamental constitutional right to retain personal control over her own body and her own destiny. The challenged statutory scheme, then, clearly does not pass muster under the second part of the *Bagley* standard.

(c) *The statutory scheme does not serve the state interest in providing medical care for indigents in a manner least offensive to the woman's right of procreative choice.*

The third and final component of the constitutional standard established in *Bagley* requires the state to "establish the unavailability of less offensive alternatives and [to] demonstrate that the conditions are drawn with narrow specificity, restricting the exercise of constitutional rights only to the extent necessary to maintain the integrity of the program which confers the benefits." (65 Cal.2d at p. 507.) In effect, this part of the *Bagley* test requires the state to adopt the "least offensive alternative" adequate to achieve any legitimate state interest.[28]

---

[27]Indeed, the California Legislature has itself recognized the importance of avoiding such discrimination against the poor as one general purpose of the Medi-Cal program. Section 14000 of the Welfare and Institutions Code, in defining the purpose of the Medi-Cal program, emphasizes that "[i]t is intended that whenever possible and feasible...[t]he means employed shall be such as to allow, to the extent practicable, eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability." As we have seen, the elimination of funds for abortion is not related to preserving the feasibility or practicability of the Medi-Cal program.

[28]Again, this requirement parallels the requirement that the state, to sustain legislation subject to strict judicial scrutiny under the equal protection clause, must demonstrate "'not only that it has a *compelling* interest which justifies the law, but that the distinctions drawn by the law are *necessary* to further its purpose.'" (Original italics.) (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 761 [135 Cal.Rptr. 345, 557 P.2d 929].)

If we view the Budget Act restrictions as intended to prevent indigent women from obtaining abortions, the doctrine of "least offensive alternative" plays no role; the restrictions fail because the state's interest in protecting the fetus cannot be pursued by subordinating the woman's right of procreative choice. In an effort to avoid the unconstitutionality of the funding restrictions, however, the Attorney General suggests an alternative interpretation: he argues that the restrictions should not be considered a legislative attempt to prevent the poor from obtaining abortions, but rather as an effort to aid poor women who have already decided to bear a child but cannot afford the expenses of childbirth. That argument, however, fails the "least restrictive alternative" test, since the state could readily meet the needs of indigent women without burdening their right of procreative choice simply by funding impartially the expenses of childbirth and abortion.[29]

Moreover, the legislative background of the statute in question belies the Attorney General's suggestion that the legislation was aimed solely at aiding poor women who have already chosen to bear a child. The Budget Act provisions do not increase preexisting levels of childbirth-related benefits or provide any additional aid at all to poor women who choose to bear a child. Instead, the statute simply curtails the medical benefits previously available to poor women who desire to have an abortion. Quite clearly, this legislation cannot be defended as aiding poor women who wish to have children by the means least offensive to the constitutional rights of other women.

---

[29]The Pregnancy Freedom of Choice Act (Welf. & Inst. Code, § 16145 et seq.) provides an excellent example of a program designed to aid indigent women who choose to bear children without impinging upon the rights of those who choose abortion. Section 16145 states the purpose of this act: "The Legislature finds that pregnancy among unmarried persons under 21 years of age constitutes an increasing social problem in the State of California. In order to have effective freedom of choice between an abortion and carrying pregnancy to term, the assistance of the state in addition to medical services is required. The problem can be alleviated effectively by a program of structured services, including counseling and residential treatment services, provided by licensed maternity homes." Subsequent sections provide for state reimbursement of expenses incurred by maternity homes in providing the specified services.

The act, by its title and declared purpose, signifies a legislative recognition that women are entitled to *effective* freedom of choice, and that effective freedom of choice may require state-assisted medical services. Because childbirth may involve care and counseling needs beyond those required for abortion, the act establishes a state program to provide those needs. It thus serves a state objective to eliminate financial considerations that make one choice more expensive than the other, thereby granting the woman effective freedom of choice; the Budget Act, by contrast, seeks to make abortion prohibitively expensive relative to childbirth and thereby to control the woman's choice.

## 5. *Conclusion.*

As noted at the outset, our opinion in this case does not rest upon this court's views as to the morality or immorality of abortion. The morality of abortion is not a legal or constitutional issue; it is a matter of philosophy, of ethics, and of theology. It is a subject upon which reasonable people can, and do, adhere to vastly divergent convictions and principles.[30]

By virtue of the explicit protection afforded an individual's inalienable right of privacy by article I, section 1 of the California Constitution, however, the decision whether to bear a child or to have an abortion is so private and so intimate that each woman in this state —rich or poor—is guaranteed the constitutional right to make that decision *as an individual*, uncoerced by governmental intrusion. Because a woman's right to choose whether or not to bear a child is explicitly afforded this constitutional protection, in California the question of whether an individual woman should or should not terminate her pregnancy is not a matter that may be put to a vote of the Legislature.

If the state cannot directly prohibit a woman's right to obtain an abortion, may the state by discriminatory financing indirectly nullify that constitutional right? Can the state tell an indigent person that the state will provide him with welfare benefits only upon the condition that he join a designated political party or subscribe to a particular newspaper that is favored by the government? Can the state tell a poor woman that it will pay for her needed medical care but only if she gives up her constitutional right to choose whether or not to have a child?

There is no greater power than the power of the purse. If the government can use it to nullify constitutional rights, by conditioning benefits only upon the sacrifice of such rights, the Bill of Rights could eventually become a yellowing scrap of paper. Once the state furnishes medical care to poor women in general, it cannot withdraw part of that care

---

[30]In *Roe* v. *Wade, supra*, the United States Supreme Court expressly took note of "the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views,...and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experience, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion." (410 U.S. at p. 116 [35 L.Ed.2d at p. 156].)

solely because a woman exercises her constitutional right to choose to have an abortion.[31]

Indeed, the statutory scheme before us is all the more invidious because its practical effect is to deny to poor women the right of choice guaranteed to the rich.[32] An affluent woman who desires to terminate her pregnancy enjoys the full right to obtain a medical abortion, regardless of the opposition of any legislative majority. By contrast, when the state finances the costs of childbirth, but will not finance the termination of pregnancy, it realistically forces an indigent pregnant woman to choose childbirth even though she has the constitutional right to refuse to do so.

Thus, we conclude that the restrictions in question are invalid under the California Constitution. We note that the Supreme Judicial Court of Massachusetts has very recently reached precisely the same conclusion in adjudicating the validity of a comparable state statute against the guarantees of that state's Constitution. (*Moe* v. *Secretary of Administration & Finance* (1981) — Mass. — [417 N.E.2d 387].) As the Massachusetts high court observed, although "the Legislature need not subsidize any of the costs associated with childbearing, or with health care generally...once it chooses to enter the constitutionally protected area of choice, it must do so with genuine indifference. It may not weight the options open to the pregnant woman by its allocation of public funds; in this area, government is not free to 'achieve with carrots what [it] is forbidden to achieve with sticks.' L. Tribe, American Constitutional Law, § 15-10 at p. 933 n. 77 (1978)." (*Id.*, at p. 402.)

In S.F. 24069, the judgment is reversed. In S.F. 24053, the alternative writ, having served its purpose, is discharged and the peremptory writ is denied. In S.F. 24192, a peremptory writ of mandate shall issue, directing respondents to refrain from enforcing the unconstitutional restrictions in the Budget Act of 1980 challenged herein. Plaintiffs shall recover their costs in these proceedings, including reasonable attorneys

---

[31]The dissenting opinion incorrectly asserts that our opinion assumes that the state must fund the exercise of constitutional rights. To avoid any possible misunderstanding, we reiterate: the state need not fund abortions, childbirth, appendectomies, or any other medical procedure, but when it undertakes to fund medical treatment for indigents, it cannot withhold funds from some eligible persons because they exercise a constitutional right.

[32]As described in a familiar Tin Pan Alley lyric: "The rich get richer and the poor get...children." (Excerpted from "Ain't We Got Fun" by Richard Whitney.)

fees pursuant to the provisions of section 1021.5 of the Code of Civil Procedure. Because these three proceedings are inextricably interrelated, on remand of S.F. 24069 the San Francisco Superior Court shall fix an appropriate cost award, including attorneys fees, by reference to the costs and attorney services expended in all three proceedings.

Mosk, J., and Newman, J., concurred.

BIRD, C. J., Concurring.—If a citizen's freedom to choose how to deal with procreation—contraception, abortion, or childbirth—is a fundamental constitutional right protected by the right to privacy, may the state constitutionally limit that choice for poor women when their choice is not one of the methods favored by the state? I agree with the lead opinion that the answer to this question is "no." However, I would reach that conclusion by a somewhat different route.

It should be emphasized that this court is not called upon today to enter into the contemporary debate over various moral, religious, and social questions concerning abortion. Emotions on that subject have always run high. However, what we justices, as individuals, may think about these questions bears no relationship to the legal issue presented in this case.

That issue is a narrow one. Once the state undertakes funding of medical care for the poor, including all types of procreative care, may the state refuse funding for an unpopular but constitutionally protected alternative? There is no claim that poor women have an absolute right to abortion funding. Rather, petitioners argue that the state should not be able to select that choice and influence that private decision by discriminatorily denying funds for one procreative alternative which the state deems unacceptable.

It is important to note that this is *not* a case in which this court must decide whether abortion is the best alternative to pregnancy or whether abortion is morally justifiable. Under the California Constitution, the people of the state have decided that those value judgments must be reserved to the individual citizens whose lives are affected by such decisions. Neither legislators nor judges may constitutionally impose their system of values on a woman who must decide how to deal with procreation.

A woman who faces an unplanned pregnancy confronts a critical and uniquely important decision, the consequences of which will follow her

throughout her life. Because her value system, her life, and her relationships with others are all involved in any determination she makes, a woman's right to decide for herself without the interference of the state is central in a free society. In recognition of the importance of that right, both this court in *People v. Belous* (1969) 71 Cal.2d 954 [80 Cal.Rptr. 354, 458 P.2d 194] and the Supreme Court in *Roe v. Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705] have held that such a private decision must be given *constitutional* protection.

It is unfortunate that the dissent focuses on an issue that is not even present here. The court is not appropriating public funds for anything. (Dis. opn. of Richardson, J., *post*, at p. 305.) The Legislature appropriated funds in its 1980 Budget Act to pay for abortions for Medi-Cal recipients in the event that its restrictions were held to be unconstitutional.[1] In so doing, the Legislature signaled the fact that it harbored doubts about the constitutional validity of the restrictions.

A fundamental right has been defined as one which is "implicit in the concept of ordered liberty." (*Palko v. Connecticut* (1937) 302 U.S. 319, 325 [82 L.Ed. 288, 292, 58 S.Ct. 149].) It is the state's obligation to protect and safeguard these rights. If any action by the state burdens the exercise of any fundamental liberty, the state must justify such an act by a showing of compelling necessity. (E.g., *People v. Belous, supra*, 71 Cal.2d 954, 963-964; *Roe v. Wade, supra*, 410 U.S. 113, 155-156 [35 L.Ed.2d 147, 178-179].) As the guardian of our rights, the state is required to show a critical need for any action which curbs the exercise of these freedoms. This is true whether the incursion involves a direct attack on the exercise of the right or an indirect interference with its exercise.

---

[1]"Provided further, that if any of the provisions of this item or the application thereof to any person or circumstances is stayed, enjoined, otherwise delayed, or invalidated by court action, the Department of Finance shall authorize the State Controller to transfer from Item 287 to this item such sums determined by the Director of Finance which are necessary to provide for the costs of those abortions fundable as a result of such court action." (Stats. 1980, ch. 510, item 287.5.)

It is clear that the power of the judiciary to invalidate statutes found inconsistent with the Constitution is not limited to those cases in which there is no resulting fiscal burden on the state. (*Moe v. Secretary of Administration & Finance* (1981) — Mass. — [417 N.E.2d 387, 395]. See, e.g., *Shapiro v. Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]; *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]; *Salas v. Cortez* (1979) 24 Cal.3d 22 [154 Cal.Rptr. 529, 593 P.2d 226]; *Payne v. Superior Court* (1976) 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565]; *Parrish v. Civil Service Commission* (1967) 66 Cal.2d 260 [57 Cal.Rptr. 623, 425 P.2d 223].)

An artificial distinction between so-called direct and indirect infringements begs the question as to whether the state has infringed a fundamental right. In California, there is no precedent for permitting government to burden the exercise of vital constitutional rights without establishing a compelling need. The fact that the state has not banned the exercise of the right entirely is irrelevant to the basic issue. Our courts have frequently struck down restrictions that did not completely prohibit the exercise of a fundamental right. (See, e.g., *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885]; *Parrish* v. *Civil Service Commission, supra*, 66 Cal.2d 260; *Salas* v. *Cortez, supra*, 24 Cal.3d 22; *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].) If the exercise of the right is burdened, a compelling interest must be shown to avoid constitutional invalidity regardless of the manner of infringement.

The fundamental right at issue is the right to private procreative choice free from governmental interference. Petitioners assert that where an individual's decision is constitutionally protected, the government is obligated to maintain a neutral stance. As Justice Brennan has observed, "[t]he proposition for which these cases stand thus is not that the State is under an affirmative obligation to ensure access to abortions for all who may desire them; *it is that the State must refrain from wielding its enormous power and influence in a manner that might burden the pregnant woman's freedom to choose whether to have an abortion.* The [restriction's] denial of public funds for medically necessary abortions plainly intrudes upon this constitutionally protected decision, for both by design and in effect it serves to coerce indigent pregnant women to bear children that they would otherwise elect not to have." (Fn. omitted; italics added.) (*Harris* v. *McRae* (1980) 448 U.S. 297, 329 [65 L.Ed.2d 784, 812, 100 S.Ct. 2671], *Williams* v. *Zbaraz* (1980) 448 U.S. 358 [65 L.Ed.2d 831, 100 S.Ct. 2694, 2702 (dis. opn. of Brennan, J.); see also, *id.*, at pp. 349, 355 [65 L.Ed.2d at pp. 825, 829, 100 S.Ct. at pp. 2712, 2715] (dis. opn. of Stevens, J.); *Moe* v. *Secretary of Administration & Finance, supra*, 417 N.E.2d at pp. 397-404.)

The practical impact of these restrictions is to burden the right of choice. Women, who are dependent on Medi-Cal for all of their health care needs because of indigency, are effectively denied the choice of abortion except under the most stringent conditions approved by the state. Justice Brennan's words are once again instructive. These restrictions are "a transparent attempt by the Legislative Branch to impose

the political majority's judgment of the morally acceptable and socially desirable preference on a sensitive and intimate decision that the Constitution entrusts to the individual. Worse yet, [the restriction] does not foist that majoritarian viewpoint with equal measure upon everyone in our Nation, rich and poor alike; rather, it imposes that viewpoint only upon that segment of our society which, because of its position of political powerlessness, is least able to defend its privacy rights from the encroachments of state-mandated morality." (*Harris* v. *McRae, supra,* 448 U.S. at p. 332 [65 L.Ed.2d at p. 814, 100 S.Ct. at p. 2703].)

I agree with the result reached in the lead opinion of this court. However, I would evaluate these restrictions under the strict judicial scrutiny test used to assess *any* governmental action which burdens the exercise of a fundamental right. (*People* v. *Belous, supra,* 71 Cal.2d at pp. 963-964.)[2] In this case, the state must show a compelling interest to justify a curtailment of the right of privacy, a right expressly protected by the California Constitution in its Declaration of Rights (Cal. Const., art. I, § 1). (*City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130 [164 Cal.Rptr. 539, 610 P.2d 436]; *White* v. *Davis, supra,* 13 Cal.3d 757, 772, 775. Cf. *People* v. *Belous, supra,* 71 Cal.2d at p. 964.)

---

[2]The majority suggests that the test of *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409] must be used to evaluate governmental benefit programs that restrict the exercise of a fundamental right through the imposition of an indirect burden or a condition. Since I find no constitutional distinction between direct burdens and indirect burdens or conditions (see *post* at p. 290), I would apply the traditional strict scrutiny standard.

*Bagley* was one case in a line of California cases which held that conditions on the exercise of a fundamental right must be reviewed with the same close scrutiny as a direct burden on those rights. (Cf. *Danskin* v. *San Diego Unified Sch. Dist., supra,* 28 Cal.2d 536.) At the time *Bagley* was written, the concept of close scrutiny had not been fully developed. *Bagley* represents an early attempt by this court to formulate a standard for this close scrutiny. As such, it contains many of the concepts that were later incorporated into the doctrine of strict scrutiny. However, *Bagley* was not the final word of this court on the subject. Its precise formulation of the standard to be used has been superseded by later developments. (See *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578-586 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; *People* v. *Belous, supra.*)

*Bagley* has generated some confusion in the Courts of Appeal precisely because its language does not match the language of strict scrutiny found in the cases which followed it. In 1971, this court cited *Bagley* as authority for the proposition that the state could not impair the exercise of a fundamental right without demonstrating a compelling interest. (*Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 778-779 [97 Cal.Rptr. 657, 489 P.2d 537].) Over the years, the three-pronged test of *Bagley* has not been followed. The only part of the test which has been consistently applied deals with the infringement by the state of a fundamental right and the requirement of greater scrutiny by the courts. (*Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575, 585-586 [100 Cal.Rptr. 16, 493 P.2d 480]; *White* v. *Davis, supra,* 13 Cal.3d 757, 772; *Merco*

This compelling interest must be proven by the state whether it directly *or* indirectly interferes with the exercise of a fundamental right. The facts of this case illustrate how direct or indirect governmental infringement can, with equal force, stifle the assertion of a constitutionally protected right.[3] (*Moe* v. *Secretary of Administration & Finance, supra,* 417 N.E.2d at pp. 397-404; see, e.g., *Harris* v. *McRae, supra,* 448 U.S. at pp. 334-336 [65 L.Ed.2d at pp. 815-817, 100 S.Ct. at pp. 2704-2705] (dis. opn. of Brennan, J.). Cf. *Healy* v. *James* (1972) 408 U.S. 169, 183 [33 L.Ed.2d 266, 280-281, 92 S.Ct. 2338]; *N. A. A. C. P.* v. *Alabama* (1958) 357 U.S. 449, 460-463 [2 L.Ed.2d 1488, 1498-1500, 78 S.Ct. 1163]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 404-406 [10 L.Ed.2d 965, 970-972, 83 S.Ct. 1790]; *Danskin* v. *San Diego Unified Sch. Dist., supra,* 28 Cal.2d 536; Perry, *The Abortion Funding Cases: A Comment on the Supreme Court's Role in American Government* (1978) 66 Geo.L.J. 1191, 1196, 1198 [hereinafter cited as *Abortion Funding Cases*].) Consequently, the funding restrictions by the Legislature must be judged by the same standard applicable to any direct burden placed by the state on the right of privacy. This is exactly what the Massachusetts Supreme Court did in *Moe* v. *Secretary of Administration & Finance, supra,* 417 N.E.2d 387, 397-404.

---

*Constr. Engineers, Inc.* v. *Los Angeles Unified Sch. Dist.* (1969) 274 Cal.App.2d 154, 169 [79 Cal.Rptr. 23]; *Healdsburg Police Officers Assn.* v. *City of Healdsburg* (1976) 57 Cal.App.3d 444, 450 [129 Cal.Rptr. 216]. See also, *Bogacki* v. *Board of Supervisors, supra,* 5 Cal.3d 771, 796-797, fn. 12 (dis. opn. of Tobriner, J.). But see *Binet-Montessori, Inc.* v. *San Francisco Unified School Dist.* (1979) 98 Cal.App.3d 991 [160 Cal.Rptr. 38].)

The conclusion in these cases that the *Bagley* standard is equivalent to a compelling state interest standard is understandable in light of its history. (Compare the language of the *Belous* test, *post,* at fn. 3.) *Bagley* has been applied exclusively to cases which involved restrictions on a fundamental right. When the language and result reached in *Bagley* are closely examined, it becomes clear that this court employed a de facto strict scrutiny test.

I disagree with any implication that in future cases an impairment of a right not currently deemed fundamental may be justifiable if the state can show a less than compelling interest. Since the facts of this case do not present this issue, I think it unwise to lay the groundwork for such a decision through dictum, particularly where the issue was neither presented nor briefed. Further, a balancing of degrees of burden and degrees of "fundamentalness" presents a task that the judiciary is no more capable of performing in the area of due process than it is in the area of equal protection. (See *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 607-610 [150 Cal.Rptr. 435, 586 P.2d 916] (conc. opn. of Bird, C. J.).)

*Bagley* does not compel such a balancing of rights and interests. The implication in *Bagley* that restrictions on a less than fundamental right would call for a lesser standard of review is dictum and has been superseded by later developments in the doctrine of fundamental rights.

[3]The former criminal statutes prohibiting abortion provide an example of direct infringement in this area. Those statutes were declared unconstitutional. Their impact

In California, this argument is even more compelling by virtue of this state's long history of providing substantial protection to the right of private choice in intimate affairs. Years before the federal courts adopted a similar rule nationally, the California courts recognized the right of privacy in making a decision concerning whether to carry a child to full term or to abort. (*People* v. *Belous, supra,* 71 Cal.2d at pp. 963-964.)[4]

Moreover, before the federal courts came to acknowledge that the freedom of choice in this intimate area of human activity involved the fundamental right of privacy, the voters of California added an express right of privacy to the state Declaration of Rights. In November 1972, article I, section 1 of the state Constitution was amended to include privacy among this state's citizens' inalienable rights.[5] The election brochure given to the voters asserted that "[t]he right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose . . . . [¶] . . . The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth, and Ninth Amendments to the U.S. Constitution. This right should be abridged only where there is *compelling public need.*" (Italics added.)

fell most heavily on women who could not afford costly illegal abortions locally or legal abortions in other countries. (See Callahan, Abortion: Law, Choice and Morality (1970) pp. 136-137; Rosen, *Psychiatric Implications of Abortion: A Case Study in Social Hypocrisy,* in Abortion and the Law (Smith edit. 1967) pp. 90-92; Charles & Alexander, *Abortions for Poor and Nonwhite Women: A Denial of Equal Protection* (1971) 23 Hastings L.J. 147, 150-156.) This case presents an indirect infringement the results of which are the same. Thus, it is a distinction without a difference to assert that because the governmental action is indirect rather than direct, the infringements which result are of less significance constitutionally.

[4]This court in *Belous* recognized "[t]he fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgment of a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex. [Citations.] . . . [¶] The critical issue is not whether such rights exist, but whether the state has a compelling interest in the regulation of a subject which is within the police powers of the state [citations], whether the regulation is 'necessary . . . to the accomplishment of a permissible state policy' [citations], and whether legislation impinging on constitutionally protected areas is narrowly drawn and not of 'unlimited and indiscriminate sweep' [citations]." (71 Cal.2d at pp. 963-964.)

[5]Article I, section 1 now reads: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy.*" (Italics added.)

The proponents, in arguing for the amendment's passage, stated that, "[t]he right to privacy is much more than 'unnecessary wordage.' It is fundamental in any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment will *extend* various court decisions on privacy to insure protection of our basic rights."[6] (Italics added.)

Our Constitution and our case law have placed California in the forefront of protecting privacy rights. Consistently, decisions by our state courts involving privacy have recognized these important interests before the federal courts and have more broadly defined them. For example, in *Ballard* v. *Anderson, supra,* 4 Cal.3d 873, this court prohibited the invasion of a minor's right of privacy when it refused to rewrite a statute to require parental consent for a minor's abortion. The analogous federal case, *Planned Parenthood of Missouri v. Danforth* (1976) 428 U.S. 52, 72-75 [49 L.Ed.2d 788, 806-808, 96 S.Ct. 2831], came to a similar conclusion some five years later. (And compare, e.g., *Perez* v. *Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17] with *Loving* v. *Virginia* (1967) 388 U.S. 1 [18 L.Ed.2d 1010, 87 S.Ct. 1817] [right to marry person of one's choice irrespective of race]; *In re Klor* (1966) 64 Cal.2d 816 [51 Cal.Rptr. 903, 415 P.2d 791] with *Stanley* v. *Georgia* (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243] [right to private possession of obscene material in one's home]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333], cert. den., 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335] with *Payton v. New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371] [protection from warrantless arrest in the home].)

In addition, the constitutional provision giving each California citizen a right of privacy has been held to be greater in scope than similar federal rights. (Compare *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123, 129 with *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1 [39 L.Ed.2d 797, 94 S.Ct. 1536] and *Moore* v. *East Cleveland* (1977) 431 U.S. 494 [52 L.Ed.2d 531, 97 S.Ct. 1932].)

Further, the California Legislature has often acknowledged the importance of privacy protections. For example, California has recognized

---

[6]This extension of court decisions obviously included the extant decisions of this court in the area of freedom of choice and a citizen's right to privacy in areas dealing with procreation. (See *Ballard* v. *Anderson* (1971) 4 Cal.3d 873 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]; *People* v. *Belous, supra,* 71 Cal.2d 954.)

that adults have a fundamental right to control decisions relating to their medical care. In this regard, the Legislature enacted the Natural Death Act (Health & Saf. Code, § 7185 et seq.), which concerns the right of an adult to decide whether to have life-sustaining procedures withheld or withdrawn in the event of a terminal illness. Also, section 1708.5 was added to the Health and Safety Code enabling physicians to lawfully prescribe laetrile or amygdalin to any terminal cancer patient who chooses that form of cancer therapy. (See *People* v. *Privitera* (1979) 23 Cal.3d 697, 711 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R. 4th 178] (dis. opn. of Bird, C. J.); *id.*, at p. 740 (dis. opn. of Newman, J.).)

The Legislature has also acted to protect privacy in other areas of its citizens' lives. (See, e.g., Civ. Code, §§ 34.5-34.10 [right of a minor to obtain medical care without parental consent, for, inter alia, the prevention or treatment of pregnancy, and for rape, sexual assault, and drug or alcohol related problems]; Ed. Code, § 67140 et seq. [protecting the privacy of students' records]; Pen. Code, § 626.11 [protecting the right of privacy of persons renting rooms in student dormitories owned or operated by a state university, state college, or community college]; Civ. Code, § 1785.1 et seq. [the Consumer Credit Reporting Agencies Act]; *id.*, § 1786 et seq. [the Investigative Consumer Reporting Agencies Act]; *id.*, § 1798 et seq. [the Information Practices Act of 1977]; *id.*, 1799 et seq. [prohibiting the unauthorized disclosure of business records]; Welf. & Inst. Code, § 5325.1 [protecting privacy rights of the mentally ill]; Note, *California "Consenting Adults" Law: The Sex Act in Perspective* (1976) 13 San Diego L.Rev. 439 [discussing the Legislature's repeal of former Penal Code restrictions on private sexual behavior between consenting adults].)

Thus, the right of privacy in California has never been dependent upon analogous federal decisions.[7] This state's special concern for individual privacy is understandable when viewed from an historical perspective. The California Constitution has traditionally embodied innovations and concerns for individual liberties. (David, *Our California Constitutions: Retrospections In This Bicentennial Year* (1976) 3 Hastings Const. L.Q. 697.)[8] This is a reflection of California's origins, for

---

[7]Our Constitution provides: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." (Cal. Const., art. I, § 24.)

[8]Judge David notes, for example, the prohibitions against slavery and the grant of women's suffrage long before such tenets were nationally adopted. (*Id.*, at pp. 713, 727-728.)

this state developed from a pioneer society comprised of a diverse group of people. (*Id.*, at pp. 698-699.)

As the lead opinion ably demonstrates, California's protection of individual rights has been a bulwark against an erosion of our citizens' liberties. Predictably, California has advanced beyond the federal analysis when dealing with the selective withholding of governmental benefits based solely on the recipients' exercise of their rights. (See lead opn., *ante*, at pp. 257, 263-267.)

Recognition of the right of privacy in California is an historical fact underscored by our decisional law. California citizens' basic right of privacy has never been dependent upon federal recognition of a similar right. Therefore, this court is not obligated to limit our citizens' rights simply because the federal courts have decided to change direction. The independent obligation to interpret this state's Constitution (see lead opn., *ante*, at pp. 260-262) imposes upon this court the responsibility to be consistent in giving life to the principles which that document embodies. When the federal courts radically depart from *Roe* and its progeny,[9] it is this court's duty to examine this state's constitutional requirements in order to decide if such a change is permissible.

As a result, the federal cases are of limited use in this context. Our state Constitution mandates a stricter standard than that used by the Supreme Court when examining funding restrictions which impair the right of privacy.

However, it is instructive to consider the reasoning of the Supreme Court when it dealt with this politically sensitive issue. That court held that legislative restrictions on abortion funding do not impair a citizen's right of private choice since they merely discourage the choice of abortion by granting a benefit (maternity care) to "encourage[ ] [an]

[9]The abortion funding cases of the United States Supreme Court have been criticized as inconsistent with *Roe* v. *Wade, supra,* and other federal cases. (*Moe* v. *Secretary of Administration & Finance, supra,* 417 N.E.2d at pp. 397-404; *Harris* v. *McRae, supra,* 448 U.S. at p. 329 [65 L.Ed.2d at p. 812, 100 S.Ct. at p. 2702] (dis. opn. of Brennan, J.); *id.* at p. 337 [65 L.Ed.2d at p. 817, 100 S.Ct. at p. 2706] (dis. opn. of Marshall, J.); *Abortion Funding Cases, supra,* 66 Geo. L.J. at pp. 1197-1201; Perry, *Why the Supreme Court Was Plainly Wrong in the Hyde Amendment Case: A Brief Comment on Harris v. McRae* (1980) 32 Stan. L.Rev. 1113; Tribe, American Constitutional Law (1978) § 15-10, pp. 933-934, fn. 77 [hereinafter cited as Tribe]; Note, *The Supreme Court, 1979 Term* (1980) 94 Harv. L.Rev. 1, 96, 99-102; Note, *Committee to Defend Reproductive Rights v. Myers: Medi-Cal Funding of Abortion* (1979) 9 Golden Gate L. Rev. 361, 384-387.)

alternative activity." (*Harris* v. *McRae, supra*, 448 U.S. at p. 315 [65 L.Ed.2d at p. 803, 100 S.Ct. at p. 2687].) This view allows the state to avoid the requirement of establishing a compelling state interest by engaging in the sophistry that there has been no barrier erected around a woman's right of choice.

Further, such a holding encourages the state to set up devious intrusions on its citizens' fundamental rights since it can do so with impunity. It is clear that the state may not directly prohibit its citizens' right to choose abortion as a method by which to deal with procreation. (*People* v. *Belous, supra*, 71 Cal.2d 954.) That rule of constitutional law is circumvented when the state refuses to fund abortions for those dependent on the state for medical care. "[A]rticulating the purpose [of the challenged restrictions] as 'encouraging normal childbirth' does not camouflage the simple fact that the purpose, more starkly expressed, is discouraging abortion." (*Abortion Funding Cases, supra*, 66 Geo. L.J. at p. 1196.)

Additionally, the distinction between prohibitions and benefits arbitrarily separates the existence of a right from the realization and enjoyment of that right. (*Beal* v. *Doe* (1977) 432 U.S. 438, 462-463 [53 L.Ed.2d 464, 482-483, 97 S.Ct. 2366] (dis. opn. of Blackmun, J.); see, Tribe, *supra*, § 15-10, p. 933, fn. 77.)

In California, traditional constitutional interpretation does not permit such spurious distinctions.[10] For example, in *Salas* v. *Cortez, supra*, 24 Cal.3d 22, this court held that due process entitles an indigent defendant to appointed counsel in a state-prosecuted civil suit to determine paternity. The indigent defendant was not prohibited from appearing in propria persona or from attempting to secure the funds to retain counsel or the services of pro bono counsel. Nevertheless, this court held that the significant infringement of both due process rights to a fair trial and a person's fundamental interest in a correct adjudication of the parental relationship could not be upheld absent a compelling state interest. (*Id.*, at p. 32.)

Another important case along these lines is *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d

[10]Some writers have noted that federal cases do not permit such a distinction either. (*Harris* v. *McRae, supra*, 448 U.S. at pp. 334-335 [65 L.Ed.2d at pp. 815-816, 100 S.Ct. at pp. 2704-2705] (dis. opn. of Brennan, J.); Note, *The Supreme Court, 1979 Term, supra*, 94 Harv. L.Rev. at pp. 96-107.)

341], affirmed, 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]. There, this court held that individuals must be permitted to exercise their First Amendment rights at a private shopping center notwithstanding the fact that the petitioners admittedly were not prohibited from exercising their free speech rights in other places. (See also, *In re Hoffman* (1967) 67 Cal.2d 845, 852, fn. 7 [64 Cal.Rptr. 97, 434 P.2d 353] [invalidating restrictions on First Amendment activities in railroad station].)

Similarly, *Danskin* v. *San Diego Unified Sch. Dist., supra*, 28 Cal.2d 536 stands for the proposition that the state may not grant benefits in a manner which discriminates against the exercise of fundamental rights. In that case, this court held unconstitutional a public school's refusal to permit use of its auditorium by "subversive" groups. The court stated, "It is true that the state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable." (*Id.,* at p. 547.) Since the state could not directly compel renunciation of beliefs, it could not make such renunciation a condition of receiving a public benefit. (*Id.,* at p. 546.) Also, in *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385], *Kinnear* v. *City etc. of San Francisco* (1964) 61 Cal.2d 341 [38 Cal.Rptr. 631, 392 P.2d 391], and *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, this court invalidated restrictions on public employment which forced employees to choose between public employment and their First Amendment rights.

These cases graphically illustrate the principle that a compelling interest must be found to justify direct or indirect burdens on the exercise of fundamental rights. Thus, the question here is simply whether the Budget Act restrictions at issue actually impair or burden a poor woman's right to procreative choice. It is clear that they do.

The Budget Act limitations are all the more troublesome because they result in increased health hazards to the indigent woman. (*Harris* v. *McRae, supra,* 448 U.S. at pp. 353-356 [65 L. Ed.2d at pp. 827-829, 100 S.Ct. at pp. 2714-2715] (dis. opn. of Stevens, J.).) By disallowing the funding for most abortions, the state leaves the pregnant woman to carry an unwanted pregnancy to term or encourages her to abort without medical assistance. Thus, the funding restrictions inject a coercive financial incentive that forces the individual to accept the state's choice

of either contraception or childbirth. It forces the indigent woman to exercise her choice in the fashion advocated by the state.

The Budget Act restrictions impermissibly limit the constitutionally protected choice of our female citizens. The state's attempt to justify these limitations as noncoercive is illusory. "When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men [and women]...." (*Ho Ah Kow* v. *Nunan* (D.Cal. 1879) 12 F.Cas. 252, 255 (No. 6546).) As judges and as citizens, we cannot fail to see that if the state is allowed to restrict the exercise of choice for the poor alone in this intimate area, indigent women in our society are forced to become second class citizens.[11]

**RICHARDSON, J.**—I respectfully dissent. The consequences of the majority's extended legal analysis may be reduced to a simple proposition: The State of California and its taxpayers are *constitutionally* compelled to pay for the abortions of all Medi-Cal recipients who desire them. The highest court in the land has twice held directly to the contrary. No matter. Accepting as valid the very arguments which failed to persuade the Legislature, and disregarding all deference to a coequal branch of government, the majority reaches its conclusion relying on the now familiar "independent state grounds" and on the right of "privacy" embodied in the California Constitution in 1972. As I develop below, in my view this is very dubious reasoning. Before today I had thought that it was very well settled that it was the Legislature, not the courts, which had the ultimate authority to select those benefits and services to be included in a public welfare program.

The majority's thesis is that the Legislature's decision to give public monetary assistance to welfare mothers for their childbirth expenses thereby violates the constitutional rights of mothers who prefer to abort their child. By funding the childbirth of some women, it is contended that the state "forces" other indigent women to forego their constitutional right to abort. I suggest that such distorted logic defies constitutional analysis and makes no sense. The Legislature's decision to pay for the expenses of childbirth may make birth a more financially attractive alternative than an abortion, but such a decision no more

---

[11]The lead opinion's thorough analysis of the state's interest correctly concludes that the justifications advanced by the state are not compelling. (See lead opn., *ante,* at pp. 273-274.)

"forces" women to give up abortion than funding the purchase of false teeth forces one to give up toothbrushes.

The majority indulges in semantic legerdemain, phrasing the issue in terms of the "right to procreative choice," thus broadening the question to permit its argument. It is essential that we remain very clear on what this case is *not* about. The issue is not whether a woman's constitutional right to abort may be exercised without undue governmental *interference* (*Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705]) or whether women have a right to an abortion. They do. The essential question before us is whether they have a right to abort *free of charge and at taxpayer expense*. As I will develop, these two questions involve vastly different considerations.

The majority relies primarily upon a line of cases which is wholly inapposite to the issue before us. (See *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260 [57 Cal.Rptr. 623, 425 P.2d 223]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal. Rptr. 401, 421 P.2d 409]; *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885].) It is not surprising that, using a 13-inch ruler as a constitutional measure for the challenged legislation, the majority reaches such an erroneous result.

Thus, in *Danskin* the state improperly required loyalty oaths from those persons who sought permission to use school buildings for their meetings. We held that although the state had no duty to make school buildings available for public meetings, nevertheless, if it elected to do so, it could neither arbitrarily select among permitted users nor impose unconstitutional conditions upon that use. (28 Cal.2d at pp. 545-546.) Application of this *Danskin* principle to the case before us would result in prohibiting the state from the arbitrary extension of either childbirth or abortion benefits to some but not all recipients or, alternatively, the conditioning of the receipt of such benefits upon the waiver of some constitutional right. Nothing remotely resembling such selective or coercive conduct is involved in the case before us. Contrary to the majority's claim of "discriminatory governmental treatment" (*ante,* p. 256), childbirth benefits are available to *everyone* on a nondiscriminatory basis. Such benefits are not conditioned upon the waiver of the right to abort, for that decision remains the untrammelled and voluntary choice of each aid recipient. Similarly, the limited abortion benefits which are offered by Medi-Cal are available *to everyone* meeting the

objective criteria prescribed in the legislation. (See *id.*, at p. 259, fn. 1.) The majority makes no attempt to demonstrate the arbitrariness of any of these criteria. How then can *Danskin* support the majority's holding herein?

*Bagley* is wholly inapposite. In that case, a hospital district attempted to discharge an employee because of her political activities involving district board elections. In *Bagley*, we established strict standards for measuring the propriety of governmental restrictions upon the exercise of constitutional rights as a condition to public employment. (65 Cal.2d at pp. 505-507.) The *Bagley* rationale is not relevant to our consideration of the present case. Its "three-part test" so readily borrowed by the majority is plainly ill-suited for the analytical task before us. As previously noted, the legislative action in the present case imposes no conditions whatever upon the right of particular recipients of available benefits. In contrast, the *Bagley* employee was told to forego her political rights if she wished to remain employed. No similar demands or conditions are imposed upon the beneficiaries which the Legislature has selected for inclusion in the Medi-Cal program. In short, the *Bagley* tripartite test measures the *validity* of conditions imposed upon the receipt of public benefits. The test is wholly inappropriate to measure the constitutional *adequacy* of the benefits so provided, which is the only issue before us in this case.

The third principal case, *Parrish*, is no closer on point than either *Bagley* or *Danskin*. The *Parrish* welfare recipients were required to consent to predawn eligibility searches as a condition to the receipt of public aid. We there applied the *Bagley* standards and concluded that this conditional intrusion on constitutional rights was unjustified and improper. In contrast, the present case presents no such similar conditions upon the right to receive the kinds of aid which were funded by the Legislature. With due respect, I must suggest that the majority's attempt to find refuge in such weak precedents graphically illustrates the poverty of its argument.

The cases on which the majority relies involve the imposition of unconstitutional conditions upon the receipt of public benefits. This is entirely different from the problem herein presented. Yet, relevant precedent is not lacking. It simply will not support the result which the majority obviously struggles to achieve.

Two very recent decisions of the United States Supreme Court are directly in point. The high court decided identical issues in *Harris* v. *McRae* (1980) 448 U.S. 297 [65 L.Ed.2d 784, 100 S.Ct. 2671], and *Maher* v. *Roe* (1977) 432 U.S. 464, 471-474 [53 L.Ed.2d 484, 492-495, 97 S.Ct. 2376], with results diametrically opposite to those achieved by the majority here. In each case the Supreme Court sustained budgetary restrictions upon aid for abortions. The *Maher* court upheld a Connecticut welfare regulation which, as here, provided benefits for medical services incident to childbirth but denied those which related to nontherapeutic abortions. In *Harris*, the Supreme Court upheld the federal "Medicaid" Act and the so-called "Hyde Amendment" thereto which in combined effect denied public funding for some medically necessary abortions. In both cases the high tribunal rejected several constitutional arguments raised against these funding restrictions which are identical to those adopted by the majority, including challenges based on privacy, due process and equal protection principles. The majority herein chooses to ignore the rationale of the highest court in the land which deals specifically with the precise issues presented to us.

The primary issue in *Maher* was whether restrictions upon state aid for nontherapeutic abortions impermissibly infringed upon the rights of privacy or "freedom of choice" which the Supreme Court described in *Roe* v. *Wade, supra*, 410 U.S. 113. The *Maher* court observed that although its *Roe* holding "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy" (432 U.S., at pp. 473-474 [53 L.Ed.2d at p. 494]) such a decision does not prevent the state from making "a value judgment favoring childbirth over abortion, and . . . implement[ing] that judgment by the allocation of public funds." (*Id.*, at p. 474 [53 L.Ed.2d at p. 494].) In its further amplification in *Maher* the United States Supreme Court spoke directly, and with compelling authority, to the precise point which is before us, explaining: "The Connecticut regulation before us is different in kind from the laws invalidated in our previous abortions decisions. The Connecticut [one may substitute *California*] regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. *The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions*

*that was not already there. The indigency that may make it difficult—
and in some cases, perhaps, impossible—for some women to have
abortions is neither created nor in any way affected by the Connecticut
regulation."* (*Id.*, at p. 474 [53 L.Ed.2d at pp. 494-495], italics added.)
This reasoning, in my view, is directly applicable to the present case. It
is also unanswerable. The California Legislature may constitutionally
make "a value judgment favoring childbirth over abortion and . . . im-
plement that judgment by the allocation of public funds." (*Ibid.*) Such
a choice may be sociologically unwise but it is not constitutionally
illegal.

Last year in *Harris* the high tribunal again focused its attention on
the precise issue before us, and flatly rejected the constitutional analysis
advanced by the majority that "a woman's freedom of choice carries
with it a constitutional entitlement to the financial resources to avail
herself of the full range of protected choices. The reason why was ex-
plained in *Maher*: although government may not place obstacles in the
path of a woman's exercise of her freedom of choice, it need not remove
those not of its own creation. Indigency falls in the latter category. The
financial constraints that restrict an indigent woman's ability to enjoy
the full range of constitutionally protected freedom of choice are the
product not of governmental restrictions on access to abortions, but
rather of her indigency. Although Congress has opted to subsidize
medically necessary services generally, but not certain medically neces-
sary abortions, the fact remains that the Hyde Amendment leaves an
indigent woman with at least the same range of choice in deciding
whether to obtain a medically necessary abortion as she would have had
if Congress had chosen to subsidize no health care costs at all. We are
thus not persuaded that the Hyde Amendment impinges on the consti-
tutionally protected freedom of choice recognized in *Wade*." (448 U.S.
at pp. 316-317 [65 L.Ed.2d at p. 804, 100 S.Ct. at p. 2688], fn. omitted.)

In similar fashion, the Supreme Court disposed of the due process ar-
gument, holding that there is no Fifth Amendment affirmative
entitlement to government funds necessary to "realize all the advan-
tages of that freedom" recognized by *Roe* v. *Wade* (pp. 317-318 [65 L.
Ed.2d at p. 805, 100 S.Ct. at pp. 2688-2689]).

Finally, *Harris* rejected the reasoning of the majority that the fund-
ing restrictions violated equal protection principles by providing
medically necessary services other than abortions. (Pp. 321-327 [65 L.

Ed.2d at pp. 807-811, 100 S.Ct. at pp. 2690-2693].) The high court noted that although the impact of the federal law falls upon the indigent, prior decisions had repeatedly held that poverty, standing alone, is not a suspect classification which would invoke the strict scrutiny form of analysis. (448 U.S. at pp. 322-323 [65 L.Ed.2d at pp. 808-809, 100 S.Ct. at p. 2691].)

Applying this traditional rational basis test to determine whether the federal restrictions bore such a "relationship to its legitimate interest in protecting the potential life of the fetus" (p. 324 [65 L.Ed.2d at p. 809, 100 S.Ct. at pp. 2691-2692]), the Supreme Court found such a rational basis in the state's interest in protecting the potentiality of human life. The high tribunal observed: "By subsidizing the medical expenses of indigent women who carry their pregnancies to term while not subsidizing the comparable expenses of women who undergo abortions (except those whose lives are threatened), Congress has established incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid. These incentives bear a direct relationship to the legitimate congressional interest in protecting potential life. Nor is it irrational that Congress has authorized federal reimbursement for medically necessary services generally, but not for certain medically necessary abortions. Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life. [¶] Where, as here, the Congress has neither invaded a substantive constitutional right or freedom, nor enacted legislation that purposefully operates to the detriment of a suspect class, the only requirement of equal protection is that congressional action be rationally related to a legitimate governmental interest. The Hyde Amendment satisfies that standard." (Pp. 325-326 [65 L.Ed.2d at p. 810, 100 S.Ct. at pp. 2692-2693], fns. omitted.)

The majority questions the propriety of the California Legislature's interest in promoting childbirth and protecting potential life in the course of applying its inapposite *Bagley* "three-pronged test." Contrary to the high court analysis in *Maher* and *Harris*, the majority bases its holding on the faulty premise that California must somehow demonstrate not only that its foregoing interests *might* be fostered by the funding restriction but that they inevitably *must* be so fostered, and in addition, in a manner "least offensive" to the aid recipient's "right of procreative choice." (E.g., pp. 281, 282.) The majority's test is not only unduly strict in its evaluation of California's legitimate interests, but the majority's reasoning is wholly circular, entirely begging the question

whether, indeed, there exists a right to choose between childbirth and a *free abortion performed at state expense.*

The California Legislature could reasonably believe that if free abortions "on demand" were unavailable, some women would elect to bear their children which would thereby promote the legitimate goals of encouraging childbirth and protecting fetal life. We cannot assume that the California Legislature is less protective of potential life than is the United States Congress. The Legislature also could assume that other women, no longer able to obtain abortions paid for by the taxpayers, might be encouraged before conception to discover and practice more effective birth control methods, thereby reducing to a considerable degree public welfare expenditures.

Thus, while the majority compares the cost of abortions with the cost of child bearing (*ante*, p. 277), it disregards a third "procreative choice" available to the indigent woman who prefers not to bear a child: use of effective contraception. Numerous birth control methods and techniques of varying degrees of effectiveness are available as alternatives to either pregnancy or abortion. Recognizing of course that no present method is infallible, I suggest that the majority errs in its assumption that "when the state finances the costs of childbirth, but will not finance the termination of pregnancy, it realistically forces the indigent woman to choose childbirth . . . ." (*Ante*, p. 285.) Instead, the Legislature may well have wished to encourage a "procreative choice" at an earlier stage by promoting the use of voluntary birth control.

The principal flaw, however, which runs throughout the entirety of the majority's theory is the erroneous assumption that if a woman has a constitutional right of "freedom of choice" in the matter of whether or not to bear her child it necessarily follows that the State of California and its taxpayers must pay for the costs of the exercise of that right. Fortunately, that sweeping generalization is not so, and never has been so in our constitutional history. A citizen clearly has a constitutional right to travel where and when he pleases. I have never heard it suggested that he is constitutionally entitled to a free trip to the Bahamas paid for from the public treasury. Every citizen has a constitutional right to vote, but he has no constitutional right to a free taxi ride to the polling place. Every citizen may run for public office, but I know of no case holding that he has a constitutional right to public funds to help him get elected. He has a constitutional right to express his views on

public affairs, but he has no constitutional right to a free mailing of his views, or a free hall paid for by the taxpayers within which he may expound them. Even when, by a divided court, we recently recognized a right of representation for incarcerated indigent civil defendants we very carefully abstained from recognizing that such a right constituted any enforceable claim against the public treasury for the payment of such representation. (*Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 920, fn. 6 [132 Cal.Rptr. 405, 553 P.2d 565].) In short, the recognition of constitutional rights does not carry with it any corollary constitutional obligation on the state Legislature to furnish, out of public funds, the full and unrestricted implementation of those rights. This fact is unaffected by the majority's effort to cast the issue in the form of a "protection of either procreative choice." (*Ante*, p. 256.)

Finally, I think it very doubtful that when the people of California in 1972 approved the Legislature's proposed constitutional amendment adding the "right of privacy" to the list of inalienable rights, they thought they were committing themselves to the payment of free abortions. There is nothing whatever in the history of the initiative to suggest such a bizarre result. Rather, when they added the "right of privacy" to their "inalienable rights" the people were told that the right of privacy "prevents government and business interests from collecting and stockpiling necessary information gathered for one purpose in order to serve other purposes or to embarrass us.

"Fundamental to our privacy is the ability to control circulation of personal information .... The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often we do not know that these records even exist and we are certainly unable to determine who has access to them.

"Even more dangerous is the loss of control over the accuracy of government and business records on individuals.

"The average citizen also does not have control over what information is collected about him. Much is secretly collected. We are required to report some information, regardless of our wishes for privacy or our belief that there is no public need for the information. Each time we apply for a credit card, or a life insurance policy, file a tax return,

interview for a job, or get a drivers license, a dossier is opened and an informational profile is sketched. Modern technology is capable of monitoring, centralizing and computerizing this information which eliminates any possibility of individual privacy." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 27.)

The foregoing extracts from the ballot arguments persuade me that when the people in 1972 adopted the constitutional "privacy" measure they thought they were approving restrictions on the dissemination of record information affecting and intruding upon their personal lives. This is the whole spirit of the ballot argument. It may have had wider constitutional implications, but there is nothing in the history of the amendment to suggest that the people intended to create a constitutionally protected right that was broader than the federal right of privacy declared in *Roe* v. *Wade, supra*. Certainly, the people did not intend to extend "privacy" to encompass a *constitutional* access to the public treasury for all indigents who want free abortions. Such a speculative jump in reasoning is of Olympian proportions—from a restriction on information distribution to a constitutional obligation to pay for abortions. With due deference, I suggest that such a consequence is the pure invention of the majority and not constitutionally ordained by any California "right of privacy."

It is the exclusive *legislative* prerogative, and not ours, to determine how public monies shall be appropriated, and for what purposes. The United States Supreme Court in disposing of the identical arguments adopted by the majority herein has explicitly held "[n]or is it irrational that Congress has authorized federal reimbursement for medically necessary services generally, but not for certain medically necessary abortions." (448 U.S. at p. 325 [65 L.Ed.2d at p. 810, 100 S.Ct. at p. 2692].) The same constitutional considerations which moved the high court to defer to congressional judgment should similarly prompt us to accept the judgment of the California Legislature in its adoption of the Budget Act. The California Constitution prohibits us from rewriting the Budget Act, which budget, it bears repeating, is the Governor's responsibility to propose and the Legislature's to adopt. We seriously err when we continue, on misguided constitutional grounds, to usurp the lawmaking function of the California Legislature.

I would affirm the judgment in S.F. 24069, and deny the peremptory writs sought in S.F. 24053 and S.F. 24192.

Clark, J., concurred.

Respondents' petition for a rehearing was denied April 29, 1981. Richardson, J., was of the opinion that the petition should be granted.